998 So.2d 1011 (2007)
Desmond D. WALTON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-01065-COA.
Court of Appeals of Mississippi.
November 13, 2007.
Rehearing Denied March 18, 2008.
George T. Holmes, Jackson, Attorney for Appellant.
Office of the Attorney General by John R. Henry, Attorney for Appellee.
Before MYERS, P.J., BARNES and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. Desmond Walton was convicted of murder in the Circuit Court of Forrest County and sentenced to a term of life imprisonment. He appeals, asserting two issues:
1. Whether Walton's statements to police should have been suppressed.
2. Whether Walton's trial counsel was ineffective by not seeking a jury instruction *1012 for the lesser-included offense of manslaughter.

FACTS
¶ 2. The victim, Patrick Anderson, a/k/a PoBill, was a known dealer of large quantities of illegal substances and was a member of the Black Gangster Disciples gang. He lived in Rawls Springs, a community near Hattiesburg, with his home being protected by a six-foot fence, guard dogs and closed circuit television cameras. On June 1, 2004, Anderson was found lying face down in his driveway, dead from a gunshot wound to the back. No weapon was recovered. Anderson had six hundred dollars in cash upon his person. The shooting was not recorded by the television, nor did any eyewitnesses come forward, although people observing the police investigation at the scene indicated a dark colored Lincoln automobile might have been involved. Eventually unnamed Black Gangster Disciples gang members gave police the nicknames, and one possible real name, of potential suspects.
¶ 3. On June 6, 2004, after learning that law enforcement personnel were looking for his car, Jonah Pinkney turned himself in to the George County Sheriff's Department in Lucedale, Mississippi. Pinkney gave investigators the names of Jerry Street, and two brothers, Eric and Michael Love. Like Pinkney, Michael Love and Street eventually surrendered to law enforcement. Each gave statements, and testified at trial. Essentially, Pinkney and Street implicated Walton as the shooter, and Michael Love stated that after the shooting, Walton said, "Man I did him [Anderson]; I had to do him."
¶ 4. Pinkney testified that he owned a 2002 Lincoln LS. Pinkney testified that his cousin, Jerry Street, telephoned him at his girlfriend's house in Wilmer, Alabama, on the morning of the shooting and asked for a ride to Hattiesburg. Pinkney testified that while it was not unusual for Street, and other people associated with Street, to call him and ask for a ride, his relationship with them was that he was "just a ride." Pinkney said the reason for the trip was to "see some girls." Later that morning, Street, Michael Love, Eric Love and person he did not know, but whom he later learned was Walton, came to his home in Michael Love's car. Pinkney got in his vehicle and followed them to Michael Love's brother's house in Lucedale. There, they left Michael Love's car and exchanged it for a grey pickup truck. They left Lucedale with Eric and Michael Love in the pickup truck, and Pinkney, Street and Walton in Pinkney's car.
¶ 5. The car and pickup truck traveled to Hattiesburg. There, they stopped at "some apartments." Street and Michael Love went into the apartments, and when they came out and back to the vehicles, they were "having friction." Pinkney and Street stayed at the apartments in Pinkney's car, while Eric and Michael Love used the pickup truck to drive a short distance looking for someone who "was not there." Then, Pinkney, Street, Eric Love and Desmond left the apartments in Pinkney's car, and Pinkney was told to "just ride around" the area of Rawls Springs. When Pinkney asked where they were going, Eric Love said, "he ain't there yet." Meanwhile, Michael Love continued driving in the area in his pickup truck.
¶ 6. They continued to drive around, until Michael Love flashed the lights of his pickup truck, signaling he had seen Anderson's pickup truck, which passed by Pinkney's car traveling in the opposite direction. Pinkney was told to turn around and follow Anderson's truck, but before he could complete his turn, Eric Love told him to stop, to get out of the car, and get into Michael Love's truck. Pinkney followed Anderson until Anderson pulled "into his yard." Walton told Pinkey to *1013 "pull in behind" Anderson, and Walton got out of the car. Walton was wearing a Halloween mask that looked like a skull. Anderson was walking towards Pinkney's car, and Walton met him "and they was like talking. And the next thing you know, I don't know if they got into it or what or what was said, but he [Walton] grabbed PoBill [Anderson] by the shirt, and then PoBill hollered, and he shot him." Pinkney testified that he then drove Street and Walton back to Lucedale to Street's house. Along the way, on Highway 98, Walton threw the mask out of the car. The mask was recovered days later by a Mississippi Department of Transportation employee, and Pinkney identified it at trial as the one worn by Walton.
¶ 7. At Street's house, Walton said, "that Desmond went on about how the dude must have had something. Talking about because if he hadn't nothing, he wouldn't havewhat you call ithe wouldn't have refused to go. And he was likeand Eric said likehe said something like, well, he made his choice. He made his choice. I really don't know."
¶ 8. Eric Love did not testify. He was also charged as a principal in the murder of Anderson, but at the time of Walton's trial, he was still awaiting trial. Michael Love did testify. At the time of trial Michael Love was serving a twenty-one year, eight-months sentence in federal prison for "conspiracy and crack cocaine." He testified that Anderson was his regular drug supplier and on many occasions "fronted him" drugs which he would sell and then pay Anderson. The most Anderson had "fronted him" was "fifty ounces" worth "about 12,000 [dollars]." Love testified that, due to their longstanding business relationship, Anderson "trusted" him, and he admitted that on the day of the murder, he and Eric Love drove by Anderson's home to see whether he had returned, but the reason he gave for going to Hattiesburg was to buy drugs, even though he did not need any at the time. Love contended that he stayed at the apartments when the shooting occurred and did not actually see the shooting. He said he waited for about ten minutes at the apartments and then saw Pinkney's car drive by. Eric Love got out of Pinkney's car and into Michael Love's truck, and the two men drove back together to Lucedale, Mississippi, where he met back with Pinkney, Street and Walton. He stated that Walton told him, "Man I did him [Anderson]; I had to do him." Love denied being offered any inducement for his testimony, but he did say that his sentence as an accessory after the fact in this case was being served concurrently to his federal sentence.
¶ 9. Street testified that Pinkney and the Love brothers were his cousins. His testimony was that they went to Hattiesburg to rob someone. He testified that they drove around Hattiesburg looking for someone, but he did not know it was Anderson for whom they were looking. After they saw Anderson's truck drive by, they followed him. When Anderson stopped at his house, Walton got out of Pinkney's car with a Halloween mask on and shot Anderson.
¶ 10. Walton was apprehended in Mobile, Alabama on June 11, 2004. While in custody in Alabama, Walton was interviewed twice, and the interviews were videotaped. Neither was transcribed. The first was conducted by a Drug Enforcement Agency agent concerning incidents not related to the murder charge. The circuit court suppressed this statement after the agent declined to appear in Mississippi. The second interview was conducted by Detective Don Gomien of the Mobile, Alabama, Police Department. The videotape is the subject of the first issue in this appeal. This videotape is thirty to forty minutes in length, and much of what *1014 Walton said is inaudible because he mumbled his responses, and the microphone was of poor quality. However, it is clear that, for most of the interview, Walton maintained he was innocent and did not shoot Anderson. However, at the end, he stated that he had gone to buy drugs, and during the drug deal, Anderson reached to his side or back and pulled out a handgun, and Walton shot Anderson in self-defense. The State concedes in its brief that the circuit court erred in denying Walton's motion to suppress this statement and allowing the jury to view the videotape, because Walton was not given Miranda warnings prior to the start of the second interview. Nevertheless, the State asserts the error was harmless in light of the overwhelming evidence of guilt against Walton. In his appellate brief, Walton asserts two other reasons why the circuit court erred in not suppressing the videotape of the second interview. The first interview was terminated when Walton stated that he did not want to answer any more questions before Mississippi authorities arrived. As he was being escorted back to his cell, a Mobile police officer told him that if he were going to make a statement to help himself, "now was the time." Walton then consented to the second interview. Walton asserts that the second interview was initiated by the State, and even if the interview had been initiated by him, there had been an insufficient cooling off period after the first interview ended.
¶ 11. Walton did not testify in his own defense, nor did the defense present any evidence at all.

ANALYSIS

1. WHETHER THE ERROR IN NOT SUPPRESSING WALTON'S SECOND STATEMENT WAS HARMLESS ERROR
¶ 12. Even in cases involving full confessions to all elements of a crime, statements obtained in violation of a defendant's constitutional rights have been found to be harmless error "if the whole record demonstrates beyond a reasonable doubt that it was without any substantial prejudicial effect under all of the facts and circumstances of the case." Hopkins v. State, 799 So.2d 874(¶ 10) (Miss.2001) (citing United States v. Whitaker, 592 F.2d 826, 830 (5th Cir.1979)). "The decision [of whether the error of admitting a confession was harmless] requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." Smith v. State, 907 So.2d 389(¶ 11) (Miss.Ct.App. 2005) (quoting United States v. Dixon, 593 F.2d 626, 629 (5th Cir.1979)). This determination must be made upon de novo review. Arizona v. Fulminante, 499 U.S. 279, 295-297, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
¶ 13. In the present case, Walton's statement was not a confession. Rather, Walton denied the accusation of murder and claimed self-defense. Nevertheless, the videotape was prejudicial to his defense. In the interview, Walton initially said someone else shot Anderson, though the audio is so poor that it is not clear if he actually named one of his companions as the shooter. Detective Gomien told Walton that Michael Love had already implicated him as the shooter and would shortly be brought in to make a formal, videotaped statement. Nothing in the record indicates Detective Gomien's statement was untrue, and, in fact, Michael Love so testified at trial. Walton then claimed that he had been buying drugs from Anderson, when Anderson reached under his shirt and pulled a handgun, so Walton shot him in self-defense. In the second assignment of error, Walton admits that this statement *1015 could have served as the basis for a lesser-included offense instruction on manslaughter. Nevertheless, his initial denial, and then recanting of the denial in the face of Michael Love's accusation, which the jury subsequently saw and heard Love testify to, had to have been prejudicial. However, the issue is not simply prejudice. It is, whether in light of the record as a whole, Walton would have been convicted beyond a reasonable doubt even without the tainted statement. See Smith, 907 So.2d at 394(¶ 11). We find beyond a reasonable doubt that he would have been found guilty. Three witnesses testified against him. Two testified that Walton shot the unarmed Anderson. One testified that Walton made a subsequent admission that Walton "had to do him." Anderson was shot in the back. No weapon was found on, or near, his body. The Halloween mask was introduced at trial. Walton presented no evidence in his defense. Upon this record, the jury had no basis to make any finding other than that Walton shot Anderson. Further, no lesser-included instruction was requested. The case went to the jury on a straight-up guilty or not-guilty of murder theory. Even given the improper admission of Walton's statement, the verdict of guilty of murder was beyond a reasonable doubt. There is no merit to this assignment of error.

2. WHETHER TRIAL COUNSEL WAS INEFFECTIVE IN NOT SEEKING A LESSER-INCLUDED OFFENSE INSTRUCTION OF MANSLAUGHTER
¶ 14. The scope of review for an assertion of ineffective assistance is well known. The appellant has the burden of proof of showing not only that counsel's performance was deficient, but also that he was prejudiced by it. Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Stringer v. State, 454 So.2d 468, 477 (Miss.1984). It is well settled that the decision to seek, or not to seek, a lesser-included offense instruction is one of trial strategy, and is thus accorded a high degree of deference. Maxwell v. State, 856 So.2d 513(¶ 15) (Miss.Ct.App. 2003) (no ineffectiveness of counsel in not requesting a lesser-included offense instruction on manslaughter). From the record, we cannot tell why a lesser-included offense instruction was not requested. It is clear that Walton was twenty-nine years old at the time of his conviction, and was a hardened member of a deadly gang. He may have feared a lengthy sentence on a charge carrying a twenty-year maximum sentence would have been not sufficiently less onerous than a life sentence, to risk allowing the jury to consider a charge carrying lightened elements of the crime.
¶ 15. Regardless of what actually occurred at trial, the record is insufficient for us to determine whether counsel's performance was deficient. An appellate court will only address an issue of ineffective assistance of counsel on direct appeal if the parties stipulate counsel was ineffective, or the record is clear that counsel's performance was so deficient as to raise constitutional concerns. Ramsey v. State, 959 So.2d 15 (¶¶ 30-31) (Miss.Ct.App.2006) (citing Read v. State, 430 So.2d 832, 841 (Miss.1983)). In this case, there is at least one legitimate reason Walton's counsel may have declined the lesser-included offense instruction on manslaughter. Therefore, we dismiss this issue without prejudice so as to allow Walton to raise it more properly in a petition for post-conviction relief.
¶ 16. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS *1016 AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO FORREST COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.