# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-00438-SCT

*ERIC LEWIS WILLIAMS a/k/a E ERIC*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT: 01/23/2008
TRIAL JUDGE: HON. MICHAEL M. TAYLOR
COURT FROM WHICH APPEALED: PIKE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: BENJAMIN ALLEN SUBER
 LESLIE S. LEE
 GUS GRABLE SERMOS
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: LISA LYNN BLOUNT
DISTRICT ATTORNEY: DEE BATES
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 02/12/2009
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRAVES, P.J., RANDOLPH AND PIERCE, JJ.

### RANDOLPH, JUSTICE, FOR THE COURT:

¶1. Seventeen-year-old Eric Lewis Williams was indicted for capital murder, conspiracy to commit capital murder, aggravated assault, and conspiracy to commit aggravated assault. Following a jury trial in the Circuit Court of Pike County, Mississippi, Williams was found guilty on the counts of capital murder, aggravated assault, and conspiracy to commit aggravated assault. He was then sentenced to life without the possibility of parole in the custody of the Mississippi Department of Corrections ("MDOC") for capital murder, to ten years for aggravated assault, and to five years for conspiracy to commit aggravated assault,

all to run consecutively. Following denial of his post-trial motions, Williams filed notice of appeal.

**FACTS**

¶2. On January 27, 2007, Janice Bonds was at Williams's trailer, along with her infant son and Alexander Hymes. According to Bonds, Hymes asked to borrow her black 2006 Chevy Malibu "to go to the store to get some cigarettes." Bonds further testified that Hymes:

> asked [Williams] to ride along with him. [Williams] refused to go at first. He was like, man, I don't want to go to the store. So [Hymes] just kept on pressuring [Williams] . . . to go to the store with him. So eventually [Williams] did decide to get up and go. So I gave [Hymes] the keys to go, and they went to the store.

¶3. Trish Minton was the store clerk at the MS Food Mart on Highway 48. According to Minton, Williams and Hymes entered the store and Hymes asked "to see a hat." After showing the hat to Hymes, Minton testified that "[h]e said he didn't have any money, but he wanted to look at them anyway. And [Williams] was in the back of the store." While conversing with Hymes, Minton "asked him did he go to Southwest [Community College ("Southwest")]. He said yes. And I asked him had he lost his ID, and he . . . said yes." Thereafter, Minton testified that she:

> went around to get his ID for him. The guy that was at the back [of] the store [Williams] stuck a gun to my head and said, give me all the money. So I opened the register. When I opened the register, he shot the gun, and I went down to the floor. He got the money out of the register, and then he walked around, behind the counter where I was at . . . .

According to Minton, she "asked [Williams] to please don't shoot me because I was pregnant. He told me to shut up. So I just sat there. They were looking at some stuff behind

2

the counter and went over to look at the hats." At that time, James Serigny pulled up to the store in his truck and walked in. Minton testified that Serigny:

> looked at me on the floor and he looked at them. Then he looked back at me and he walked to the back of the store. The one with the gun [Williams] followed him.
>
> And I didn't see it, but the next thing I heard was a shot and [Serigny] falling on the floor. I didn't look over or say anything at that time. I know [Hymes] was standing by the door, waiting for [Williams]. The next thing I know, they were gone and I called 9-1-1.

Minton's 911 call was received at 12:56 p.m.

¶4.     At approximately 1:15 p.m., Detective Davis Haygood of the Pike County Sheriff's Department arrived at the crime scene, ten minutes after other officers first arrived. Minton informed Haygood that the video surveillance camera was operational at the time of the incident.[1] Additionally, Haygood testified that Minton "advised that one of the defendants . . . had come in previously, a couple days prior, and had left a [Southwest] ID, which was taken back during the [incident]."

¶5.     Haygood then took Minton to Southwest "to try and attempt to identify the individual on the ID." At Southwest, Haygood testified that he:

> received a phone call from Detective James Sparacello, because when we were on the scene earlier, we had been talking about possible suspects and we had remembered that we had an attempted armed robbery at the Highway 24 BP,

_____

[1]The store surveillance video corroborated Minton's account. As the State's brief notes:

> [i]n the surveillance video you see Hymes and Williams exit their vehicle, and then enter the store. When Serigny enters the store, Williams is seen walking up behind the victim and brutally shooting Serigny in the forehead. Next you see Williams running toward the door and the two exit the store.

3

and also that Amite County had contacted us earlier in the month that they had . . . a burglary on Irene Road, right along the Amite County line, where a .40 caliber gun had been stolen.[2]  During that time they had gave us some names of some possible suspects that we were looking at for the Highway 24 attempted robbery, and also the burglary.  Detective Sparacello contacted them, was able to get the names back from them.  We knew that one of the individuals went to [Southwest].

Detective Sparacello contacted me while I was there with [Minton] and gave me the name of [Hymes].  At that time, I asked the lady that was operating the computer to pull the photo up. . . . [A]s soon as it become full face, [Minton] stated, . . . that's him.

¶6.    Hymes was subsequently arrested, his home was searched,[3] and Sparacello obtained a written statement from him.  Based upon Hymes's written statement, Williams was arrested at his residence later that evening.  Williams's uncle, Henry Sibley, gave consent to search the trailer, during which Haygood testified that "the black hat . . . we recovered in his bedroom . . . matched the description of hats at the store where the armed robbery took place."[4]  At the sheriff's department, Haygood testified that he read Williams "his rights and

---

[2]On January 5, 2007, a .40 caliber Smith & Wesson handgun was reported stolen by Raymond Price.  Price testified that Williams was his "cousin's son, step-son."  According to Price, Williams lived in a trailer "about 300 yards from where I stay[,]" and would "come over [to] shoot basketball with my daughter and his brothers."  Price testified that Williams had seen him take his guns out shooting, although he was unsure if Williams knew where the guns were kept.

[3]According to Haygood, "[t]he white shirt that [Hymes] was wearing at the time of the robbery was recovered during the search . . . ."  Moreover, Haygood testified that Hymes's Southwest ID card was found inside his wallet and that a hat was recovered from his closet "which was described by [Minton] and the [store] owners as being hats that they had in their store and taken during the [incident]."

[4]According to Haygood, "there is a price tag and it's notated on the sticker of the brand of the hat.  That is the same price tag that is used by the convenience store where the armed robbery took place."  Furthermore, Bonds testified that she first saw the hats found in the residences of Williams and Hymes "[w]hen they returned from the store."

4

waiver of rights, which he signed, stating that he understood both of those, I [then] conducted an interview with him . . . ." According to Haygood:

> [Williams] . . . stated . . . at first he did not know anything. Then we told him that we knew that he was involved.
>
> At that time, he then decided to tell us that, yes, he had committed the crime and had shot [Serigny], but did not want to give the identity of the other individual that was involved with him. It was not until we disclosed that [Hymes] had already given us a statement, that he made the determination to . . . give us a detailed statement of what took place.

Williams's "Statement Form," signed at 12:36 a.m. on January 28, 2007, provided:

> [l]ast night [Hymes] won't [sic] to go hit some licks and showed me a gun. Then that next morning I got my girlfriend[']s car and went to the store. I park at a gas pump and [Hymes] went in the store first then me. [Hymes] went to where the hats was and I want [sic] around the store, then I went to the first [sic] and told the women [sic] to open the resiger [sic] and [Hymes] got the money out and I shot at the women [sic]. Then I went to get a cap then a men [sic] walk in to the store and seen me and [Hymes's] face and I got nervos [sic] and shot the man, then went [sic] I was about to run out of the store [Hymes] point to the women [sic] telling me to shot [sic] her, but I didn't. Then we got in the car and give [Hymes] back his gun and split [sic] the money, then I took him home then I went home and told my girlfriend what I did and I told her to go home.[5]

¶7. On March 27, 2007, Williams and Hymes were indicted for capital murder,[6] conspiracy to commit capital murder, aggravated assault,[7] and conspiracy to commit

---

[5]This was corroborated by Bonds who testified that Williams "asked me to get in my car and go home." However, Bonds also testified that she took Hymes home.

[6]The capital-murder count provided that Williams and Hymes "did feloniously, wilfully, and of their malice aforethought, kill and murder [Serigny] . . . by shooting him with a firearm, at a time when they . . . were then and there engaged in the commission of the crime of robbery of the MS Food Mart, contrary to and in violation of Section 97-3-19(2)(e) . . . ."

[7]The aggravated-assault count stated that Williams and Hymes "did unlawfully, feloniously, purposely and knowingly attempt to cause bodily injury to another, namely,

5

aggravated assault.  On January 22, 2008, the jury trial of Williams commenced.  During the State's case-in-chief, the video surveillance footage from MS Food Mart was played before the jury.  Thereafter, Steve Byrd of the Mississippi Crime Laboratory was tendered and accepted as an expert "in forensic science, specializing in firearms and mark identification and examination."  After examining .40 caliber shell casings found at both the crime scene and around Price's residence, Byrd concluded "that all these cartridge cases were fired from the same gun[,]" and that gun was consistent with the .40 caliber Smith & Wesson handgun reported stolen by Price.  The pathologist who performed the autopsy on Serigny on January 28, 2007, was then tendered and accepted as an expert in the field of forensic pathology.  Based upon the autopsy, he testified that:

> [t]he entrance gunshot wound had one unusual characteristic to it – it had tattooing or unburned fragments of powder that were located predominately on the side and lower part of the entrance gunshot wound.  And tattooing is indicative that the weapon was fired in close proximity to the decedent when fired.

He added that the "[c]ause of death I ruled as gunshot wound to the forehead, near contact, penetrating, producing craniocerebral trauma.  The manner of death I ruled homicide . . . ."  The State then rested and Williams moved for a directed verdict, which motion was overruled by the circuit court.  After Williams rested, without offering any witnesses, the jury found him guilty of capital murder, aggravated assault, and conspiracy to commit aggravated assault, and not guilty of conspiracy to commit capital murder.  The sentencing order of the circuit court provided that Williams:

---

[Minton] . . . with a deadly weapon, to wit: a Smith & Wesson .40 caliber handgun, by shooting at said victim, contrary to and in violation of Section 97-3-7(2) . . . ."

for . . . his crime of Capital Murder (Count One), Aggravated Assault (Count [Three]), and Conspiracy to Commit the Crime of Aggravated Assault (Count [Four]) be sentenced . . . into the custody of the [MDOC] for and during the space of life without the possibility of parole (Count One), ten (10) years on Count Three, and five (5) years on Count Four[,] with all counts running consecutively. [Williams] is ordered to pay full restitution as it may appear and all costs associated with this case and reimburse Pike County in the amount of $2,500.00 for court appointed attorney fees.

On February 1, 2008, Williams filed a "Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial," which was denied by the circuit court. Williams then filed timely notice of appeal.

## ISSUES

¶8.    This Court will consider:

(1) Whether the circuit court abused its discretion in admitting autopsy photographs of the victim.

(2) Whether Williams received ineffective assistance of counsel.

## ANALYSIS

### I.    Whether the circuit court abused its discretion in admitting autopsy photographs of the victim.

¶9.    The State offered two autopsy photographs of Serigny into evidence. According to the pathologist:

[o]ne shows the entrance gunshot wound with an AFBO calibrated ruler to document the size of the injury. The second shows the entrance gunshot wound again, without a calibrated ruler. And both show the tattooing, the small speckled areas – they look like pinpoint areas – of hemorrhage, located near the entrance gunshot wound.

Williams objected, contending that the photographs "serv[e] no useful purpose[,]" and that the "probative value is far outweighed by the danger of unfair prejudice." The circuit judge

7

disagreed and admitted the photographs, finding they were "probative of the manner of death, the proximity of the weapon to the victim, which was the subject of testimony, as well as the subject of the surveillance material which was shown." The circuit judge added that the probative value of the photographs was "not outweighed by any danger of undue prejudice[,]" and that they were not "redundant in the sense of there's no other evidence that presents this same thing, this same way."

¶10. This Court has stated that:

> Mississippi Rule of Evidence 403 provides, in pertinent part, that relevant evidence "may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of . . . needless presentation of cumulative evidence." Miss. R. Evid. 403 (emphasis added). "The admission of photographs is a matter left to the sound discretion of the trial judge and . . . *his decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion*." **Noe v. State**, 616 So. 2d 298, 303 (Miss. 1993) (citing **Gardner v. State**, 573 So. 2d 716 (Miss. 1990)) (emphasis added). The discretion of the trial judge is "*almost* unlimited . . . regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." **Noe**, 616 So. 2d at 303 (quoting **Williams v. State**, 544 So. 2d 782, 785 (Miss. 1987)). So long as a photograph "has probative value and its introduction serves a meaningful evidentiary purpose[,]" it may still be admissible despite being "gruesome, grisly, unpleasant, or even inflammatory." **Id**. (citations omitted). . . . "Photographs are considered to have evidentiary value in the following instances: (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; (3) supplement or [clarify] witness testimony." **McIntosh v. State**, 917 So. 2d 78, 84 (Miss. 2005) (quoting **Spann v. State**, 771 So. 2d 883, 895 (Miss. 2000)).

**Dampier v. State**, 973 So. 2d 221, 230 (Miss. 2008) (emphasis in original).

¶11. Williams contends that "the *corpus delicti* of the charges and identity of the deceased were clearly established and unchallenged." As such, he maintains that "the gruesome testimony about the victim's fatal injuries from [the pathologist] were more than sufficient

8

to establish everything the [S]tate needed to prove in this case." In Williams's estimation, "there was not a legitimate reason here to display the gashed head of the victim. . . . The sole purposes of the [e]xhibits was to arouse the inherent human emotions of viewing the head of the victim." Conversely, the State argues that the photographs were not gruesome insofar as they "focused only on the gunshot wound in [Serigny's] forehead and did not contain a lot of unnecessary blood, brain matter or gore." Moreover, the State asserts that the photographs "assisted the jury in understanding [the pathologist's] testimony, as well as corroborating his testimony."

¶12. This Court finds that by supplementing the pathologist's testimony, the photographs have evidentiary value. *See McIntosh*, 917 So. 2d at 84 (quoting *Spann*, 771 So. 2d at 895). As the circuit judge stated, the photographs were probative as to "the manner of death" and "the proximity of the weapon to the victim[.]" *See Howard v. State*, 785 So. 2d 297, 301 (Miss. Ct. App. 2001) ("[t]he photographs assisted the jury in understanding [the pathologist's] testimony, as well as confirming the information that was being provided by him."). Furthermore, as in *Dampier*, this Court finds that "the trial court's burden was substantially lessened, as the photographs failed to exhibit elements of gruesomeness." *Dampier*, 973 So. 2d at 230. *Compare to McNeal v. State*, 551 So. 2d 151 (Miss. 1989) (solitary instance of photographs being held prejudicial involving a close-up photograph of a partly decomposed, maggot-infested skull). In this Court's estimation, "[w]hile the photographs are not pleasant, they are not so gruesome, hideous, and nauseating as to be inflammatory and appeal to the passion and prejudice of the jury." *Hewlett v. State*, 607 So. 2d 1097, 1102 (Miss. 1992) (citing *Willie v. State*, 585 So. 2d 660, 674 (Miss. 1991)). In

9

sum, the circuit court properly applied the test of Mississippi Rule of Evidence 403 to the photographs, determining that their probative value was "not outweighed by any danger of undue prejudice." Moreover, the circuit court noted the "meaningful evidentiary purpose and probative value" of the photographs. *Dampier*, 973 So. 2d at 230. Therefore, this Court concludes that the circuit court did not abuse its discretion in admitting the photographs. *See Noe*, 616 So. 2d at 303. Accordingly, this issue is without merit.

**II.      Whether Williams received ineffective assistance of counsel.**

¶13.    This Court has stated that:

> [t]he test to be applied in cases involving alleged ineffectiveness of counsel is whether counsel's over-all performance was (1) deficient and if so, (2) whether the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The burden is on the defendant to demonstrate both prongs. *Leatherwood v. State*, 473 So. 2d 964, 968-69 (Miss. 1985). This Court adopted the *Strickland* test in *Stringer v. State*, 454 So. 2d 468 (Miss. 1984).
>
> This state recognizes a strong but rebuttable presumption that counsel's conduct falls within a broad range of reasonable professional assistance. *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985). Also, this Court bases its decisions as to whether counsel's efforts were effective on the totality of the circumstances surrounding each case. *Waldrop v. State*, 506 So. 2d 273, 275 (Miss. 1987) . . . .

*McQuarter v. State*, 574 So. 2d 685, 687 (Miss. 1990). *See also Coleman v. State*, 749 So. 2d 1003, 1012 (Miss. 1999) ("[i]n order to find for the defendant on the issue of ineffective assistance of counsel, this Court would have to conclude that counsel's performance as a whole fell below the standard of reasonableness and that the mistakes made were serious enough to erode confidence in the outcome of the trial below.").

¶14. Williams's ineffective-assistance-of-counsel argument is based upon trial counsel's failure to object during the testimony of both Price and Byrd, in which the weapon used during the subject incident was connected to a .40 caliber Smith & Wesson handgun previously stolen from Price's residence.[8] Price testified that Williams, his "cousin's son, step-son" who lived only 300 yards away, had previously seen the stolen weapon, although he was unsure if Williams knew where it was kept. Williams asserts that "[t]he fact that Price's gun was stolen and that Williams had seen the gun before have absolutely nothing to do with this capital murder or aggravated assault. By the State indicating that Williams stole the gun, the State is introducing evidence of Williams[']s] prior bad acts and character."[9] Moreover, Williams maintains that even if this evidence is admissible under Mississippi Rule of Evidence 404(b), its probative value is "substantially outweighed by the danger of unfair prejudice," pursuant to Mississippi Rule of Evidence 403. *See Crawford v. State*, 754 So. 2d 1211, 1220 (Miss. 2000) (citing *Jenkins v. State*, 507 So. 2d 89, 93 (Miss. 1987)) ("Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass."). Specifically, "[t]he evidence that a gun was stolen from Price's house is irrelevant and prejudicial to Williams involving his trial for capital murder, aggravated assault, and

---

[8]*See* footnote 2 and paragraph 7 *supra*.

[9]Mississippi Rule of Evidence 404(b) states:

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Miss. R. Evid. 404(b).

conspiracy to commit aggravated assault." As such, Williams argues that "trial counsel was ineffective in not objecting to this prejudicial evidence."

¶15. The State responds that:

> Rule 404(b) is inapplicable in the case *sub judice*. The evidence was not offered to show Williams' character, propensity for criminal conduct, or prior bad acts of breaking in Price's house. *The evidence was offered to establish that the murder weapon was one-in-the-same gun as the weapon stolen from Price's house and that [Williams] knew the gun was in Price's house prior to it being stolen.*

(Emphasis added). The State further maintains that any prejudicial effect arising from this evidence is outweighed by its probative value, as it "establishes the gun used in the murder was the gun stolen from Price and ties Williams to the murder weapon." Accordingly, the State argues that Williams failed to prove that the absence of objection by trial counsel constituted deficient performance under **Strickland**. However, even assuming *arguendo* that "the subject evidence was inadmissible and his trial counsel's performance deficient for failing to object to its admission," the State posits that "[t]he store surveillance video, the eye witness identification by [Minton], the items recovered from the search of [Williams's] house and [Williams's] own admission of guilt were more than sufficient evidence to convict Williams."

¶16. This Court finds that the inadmissibility provisions of Rule 404(b) are inapplicable here. The subject evidence was offered to connect the murder weapon to the handgun previously stolen from Price's residence. Price testified that Williams possessed some knowledge regarding that handgun. Such evidence could be admissible under several of the exceptions noted in Rule 404(b), i.e., "opportunity, intent, preparation, plan, knowledge . .

12

. ." Miss. R. Evid. 404(b). Moreover, the probative value of that evidence, connecting Williams and the murder weapon, is not "substantially outweighed" by any prejudicial effect (*see* Mississippi Rule of Evidence 403), given the totality of the evidence. As such, this Court concludes that trial counsel's failure to object did not constitute deficient performance given the strong presumption of "reasonable professional assistance" and the totality of circumstances surrounding this case. *McQuarter*, 574 So. 2d at 687. Furthermore, even if trial counsel's failure to object did constitute deficient performance, this Court concludes that such mistakes were not "serious enough to erode confidence in the outcome of the trial below." *Coleman*, 749 So. 2d at 1012. The store surveillance video, which corroborated Minton's testimony, and Williams's admission of guilt both individually and collectively provided ample evidence justifying Williams's conviction. Therefore, at the least, Williams's defense was not prejudiced by trial counsel's failure to object. Accordingly, this issue is without merit.[10]

**CONCLUSION**

¶17. Based upon the aforementioned analysis, this Court affirms the judgment and sentencing order of the Circuit Court of Pike County.

---

[10]Williams's brief provides that "if this Court finds the record does not affirmatively show ineffective assistance of counsel, [Williams] respectfully requests the issue be dismissed without prejudice to allow Williams to supplement the record with additional evidence on post-conviction." As in *McQuarter*, this Court recognizes Williams's "right to raise the ineffective assistance claim via appropriate post-convictions proceedings." *McQuarter*, 574 So. 2d at 687 (citing *Read v. State*, 430 So. 2d 832 (Miss. 1983)). *See also Walton v. State*, 2007 Miss. App. LEXIS 757 at *12-13 (Miss. Ct. App. November 13, 2007).

¶18. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF CONSPIRACY TO COMMIT THE CRIME OF AGGRAVATED ASSAULT AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. ALL SENTENCES IN ALL COUNTS TO RUN CONSECUTIVELY. APPELLANT IS ORDERED TO PAY FULL RESTITUTION AND ALL COSTS.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY.**