# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-KA-01052-SCT

*CURTIS LERNARD SEA*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/20/2009 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | YALOBUSHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED -12/09/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., DICKINSON AND CHANDLER, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. A Yalobusha County jury found Curtis Sea not guilty on three counts of statutory rape and one count of sexual battery, but guilty on five counts of sexual battery. Without filing a pretrial motion or obtaining a ruling on the issue, Sea's counsel introduced evidence of his own client's two prior criminal convictions – both of which had occurred approximately twenty-five years prior to trial. Evidence of a party's prior criminal conduct, the confinement for which ended more than ten years earlier, is not admissible to impeach credibility, unless the trial court makes certain findings (which were not even requested in this case). Additionally, Sea's counsel sat silent as the State introduced into evidence four videotapes

of damaging forensic interviews of the four victims.[1] Sea now claims his trial counsel was ineffective. We agree.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

¶2.     During 2006 and 2007, Lashawn Joyner and her four daughters, D.D., B.J., T.J., and A.W,[2] lived with D.D.'s father, David Delaney, under less than wholesome circumstances. Delaney admitted at trial that he produced pornographic movies for a living, some of which were viewed by at least two of the children. When Lashawn was at work or school, she would often leave the girls with her aunt, Ollie May Joyner, who lived with Curtis Sea.

¶3.     One day, upon finding the kids "kind of on top of each other," Lashawn asked what was going on. When B.J. replied, "[w]e are doing nasty stuff," which she said Sea had shown them how to do, Lashawn contacted the authorities. The girls were taken to Baptist Memorial Hospital in Oxford where a physician examined the girls, but found "no tearing or any signs of abuse." The girls were then taken to Oxford Family Crisis Services, where forensic interviews of each child were videotaped. During the interviews – comprised almost entirely of leading and suggestive questions – the children made numerous incriminating statements about Sea.

¶4.     The Yalobusha County grand jury handed down a nine-count indictment charging Sea with statutory rape and sexual battery. At trial, before the prosecutor called the children to testify, the trial judge individually questioned each child in chambers to determine whether

---

[1] Sea's counsel did object later when the State requested to play the videotapes for the jury. By then, however, they already had been admitted into evidence, without objection.

[2] The children were ages four, five, seven, and nine, respectively. We use initials for the children's names to protect their identities.

they understood the taking of an oath and the obligation to be truthful. Then the children were called to testify, providing a "yes, sir" or "no, sir" answer to virtually every question. They admitted knowing that their mother's boyfriend, Darryl, made movies of naked people. A.W. testified that she had seen the movies, and that they were about people having sex. Also, the girls acknowledged getting into trouble for taking their clothes off while playing with a friend.

¶5.     Police Officer A. J. Hernandez, having interviewed the girls at the hospital, testified over a defense objection[3] that the girls had indicated they had been molested. Hernandez also testified that he had been present when Family Crisis Services in Oxford had conducted videotaped interviews of the girls; he identified the four videotapes, the prosecutor offered them into evidence, and the court admitted them without objection.

¶6.     After the prosecutor asked several more questions, he requested permission to play the videotapes for the jury. Sea's counsel stated on the record, "Your Honor, for the record, I realize this has been discussed in chambers to some extent, for the record, the defense

---

[3]     Q:              And did the girls, when you talked to them there in the hospital, indicate to you that they had been molested?
DEFENSE:    Your Honor, I am going to object to that's [*sic*] hearsay.
THE COURT: What was your question again?
STATE:         I said did they indicate to you that they had been molested?
THE COURT: To that extent, I'll permit it to come in.

3

objects to the admissibility to the tapes as inadmissible hearsay."[4] The court overruled the objection, and the tapes were played for the jury.

¶7.    After the State rested, the defense began its case-in-chief by calling Sea and asking him questions about his prior criminal conduct. Sea admitted that, in 1984, he had pleaded guilty to molesting a child under thirteen years of age. When confronted on cross-examination with documents indicating he had pleaded guilty in 1988 to an indictment for molesting another child under the age of thirteen, he at first denied it, but then testified, "If I did, I forgot about it. I'm not denying nothing. I just said I forgot about it." To this exchange concerning a second twenty-five-year-old conviction, Sea's counsel offered no objection.

¶8.    The jury acquitted Sea on three statutory-rape charges and one county of sexual battery, but found him guilty of five counts of sexual battery. The trial court sentenced him to serve twenty-five years for each count, to run concurrently. Sea obtained new counsel and now appeals, raising the following three issues: (1) Whether the tender-years exception to the hearsay rule was properly applied; (2) whether the verdict was contrary to the overwhelming weight of the evidence; and (3) whether Sea's trial counsel was ineffective.

## ANALYSIS

### I.    The videotapes

¶9.    Sea claims the trial court committed reversible error by allowing the prosecutor to play the videotapes for the jury. But because his counsel failed to make a contemporaneous

---

[4] If counsel's statement – "been discussed in chambers to some extent" – means a hearing on the admissibility of the videotapes took place, the record includes no transcript of it, so it is of no value on appeal.

objection when the tapes were introduced, he waived any objection to their content,[5] and this issue — although instructive on the issue of his counsel's effectiveness — has no merit.

## II.  Overwhelming weight of the evidence

¶10.  Sea next argues that his convictions were against the overwhelming weight of the evidence, and that the trial judge should have granted a new trial.  But we have stated clearly that we "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."[6]  We also have said that

> the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict.[7]

¶11.  In this case, the convictions are amply supported by the testimony of all four of the children and the incriminating content of the videotapes. Thus, this issue has no merit.

## III.  Ineffective assistance of counsel

¶12.  Sea next claims his counsel was ineffective, a claim we must analyze under the guidelines in *Strickland v. Washington*.[8]  An appellant must demonstrate that the lawyer's

---

[5] *Smith v. State*, 797 So. 2d 854, 856 (Miss. 2001) ("It is axiomatic that a litigant is required to make a timely objection. . . . [I]f no contemporaneous objection is made, the error, if any, is waived.").

[6] *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005).

[7] *Id*. (footnote and internal citations and quotations omitted).

[8] *Johnson v. State*, 29 So. 3d 738, 745 (Miss. 2009) (referring to *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *citing Payton v. State*, 708 So. 2d 559, 560 (Miss. 1998)).

"performance was deficient, and that . . . the deficiency prejudiced" the appellant.[9] Further, we carefully review the context of counsel's actions and, where reasonable under the circumstances, we presume that the "decisions were sound trial strategy."[10]

*Prior Convictions*

¶13. In discovery, Sea's counsel asked the State to produce Sea's criminal record "if proposed to be used to impeach . . . ." The State's response disclosed a prolific criminal background, including a conviction for sexual battery in 1984, for which Sea was ordered to serve eighteen months, and another conviction for sexual battery in 1989, for which he was ordered to serve eight months. The latter offense, according to the indictment, involved a minor child under the age of thirteen. After receiving this information, Sea's counsel did not file a motion to exclude the prior convictions, and the trial judge did not conduct a hearing on their admissibility.

¶14. After the State rested its case-in-chief, Sea's counsel called him to testify, and then announced: "I'm going to ask you about a couple of prior convictions that you have." He then proceeded to ask Sea about his 1984 and 1988 convictions, including details of the crimes. The prosecutor's cross-examination of Sea on these prior crimes – one of which had occurred twenty-five years earlier, and the other, twenty-one years earlier – consumed sixteen pages of transcript.

---

[9] *Id.* (*citing* **Leatherwood v. State**, 473 So. 2d 964, 968 (Miss. 1985)).

[10] *Id.* (*citing* **Leatherwood**, 473 So. 2d at 968-69).

6

¶15. When a criminal defendant chooses to testify, his prior criminal convictions may — under limited circumstances — be introduced for impeachment purposes. However, under our rules of evidence,

> [e]vidence of a conviction . . . is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for the conviction, whichever is the later date unless the court determines in the interests of justice that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect.

¶16. The balancing test under this rule is much more difficult than the traditional balancing test under Rule 403. Under Rule 609(b), it is not enough for the prosecutor to show that the probative value of the prior conviction outweighs its prejudicial effect; the trial judge must determine the probative value **substantially** outweighs the prejudicial effect of the prior conviction.

¶17. These prior convictions – and their attendant periods of incarceration – greatly exceeded the rule's ten-year threshold, requiring the trial judge to conduct the Rule 609 balancing test. The convictions were not admissible unless the court found that the prejudice created by the convictions was substantially outweighed by their probative value. But Sea's counsel filed no motion for exclusion of the convictions, so the trial court made no such finding.

¶18. The State does not deny that Sea's counsel was ineffective for introducing the convictions, but rather responds that Sea has failed to demonstrate he was prejudiced. We disagree.

7

¶19.    This is not a case of overwhelming physical evidence; there was no physical evidence of sexual abuse. To the contrary, the physician's examination of the children revealed no evidence of sexual abuse. The case was essentially Sea's word versus the testimony of his accusers. And while there were four accusers, their trial testimony came almost entirely from the mouth of the prosecutor, with the children responding "yes, sir" or "no, sir." A cursory reading of the excerpts of the children's testimony in the dissenting opinion may suggest otherwise, but a closer look confirms that this is true. Paragraphs 26 and 27 of the dissent contain trial testimony, and the only answers are "yes" and "no." Paragraph 28 is from the videotapes. Paragraph 29 is trial testimony, and there the child obediently answers "yes, sir" and "no, sir" exclusively. Paragraph 30 is from the videotapes. Paragraphs 31 and 32 reproduce trial testimony, and once again — with one exception ("Move up and down.") — every answer is either "yes" or "no." Paragraph 33 is from the videos. So these "extensive excerpts from their testimony"[11] confirm that, had the jury not seen the videotapes, the only evidence against Sea would have been, essentially, from the mouth of the prosecutor.

¶20.    Under these circumstances, evidence of Sea's prior convictions for sexual battery – one involving a child under thirteen years of age – was incendiary. This Court has stated "[e]vidence which is incompetent and inflammatory in character carries with it a presumption of prejudice."[12]

*The Videotapes*

---

[11] Dissenting opinion at n.18.

[12] *Gallion v. State*, 469 So. 2d 1247, 1249-50 (Miss. 1985); *see also* *Jones v. State*, 702 So. 2d 419, 422 (Miss. 1997) ("the admission of the fourteen-year-old heroin distribution convictions was manifestly prejudicial").

¶21. Additionally, we note that Sea's counsel failed to object to the introduction of the videotaped interviews of the four victims. The tapes were rife with hearsay statements from both the victims and the interviewers. Not only did Sea's counsel fail to object contemporaneously to the admission of the videotapes, but he failed to request a hearing as required by our rules of evidence.[13]

¶22. Sea also complains that his trial counsel erred by failing to seek an instruction for gratification of lust as a lesser-included offense of sexual battery. However, Sea's theory of the case was that he never had any sexually inappropriate contact with the children. We have said that "trial counsel's decision to not request a jury instruction falls under the category of trial tactics, which are not subject to review."[14] This assignment of error has no merit.

**CONCLUSION**

¶23. Because Sea's counsel was ineffective, we reverse the judgment of the Circuit Court of Yalobusha County and remand the case for a new trial.

¶24. **REVERSED AND REMANDED.**

**CARLSON AND GRAVES, P.JJ., KITCHENS AND CHANDLER, JJ., CONCUR. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., LAMAR AND PIERCE, JJ.**

**RANDOLPH, JUSTICE, DISSENTING:**

¶25. A further elaboration of the facts presented is necessary before analysis of the legal issues can be fully explored. Forty-three-year-old Curtis Lernard Sea was indicted on nine

---

[13] Miss. R. Evid. 803(25).

[14] *Neal v. State*, 15 So. 3d 388, 406 (Miss. 2009) (quoting *Smiley v. State*, 815 So. 2d 1140, 1148 (Miss. 2002)). *See also* *Long v. State*, 934 So. 2d 313, 318 (Miss. Ct. App. 2006) ("[T]his was a proper trial strategy, either all or nothing — guilty or acquittal.").

counts of sexual battery[15] and statutory rape[16] against four sisters (D.D., B.J., T.J., and A.W.), three to eight years old at the time of the crimes.

¶26.    A.W., eight years old at the time of the incident and ten years old at trial, testified[17] on direct examination, as follows:

> Q.  When you were over at your Aunt Ollie's house, did Curtis do anything bad to you?
> A.  Yes.[[18]]
> Q.  And what did he do?
> A.  Touch.
> Q.  And where did he touch you?
> A.  My middle parts.
> Q.  You call your middle parts, do you call that your privates?
> A.  Yes.
> Q.  Do you know where a boy's privates are?
> A.  Yes.
> Q.  Did he try to do anything with his privates to your privates?
> A.  Yes.
> Q.  And what did he do?
> A.  Move up and down.
> Q.  Did he put his privates inside you?

---

[15]Mississippi Code Section 97-3-95(1)(d) provides that "[a] person is guilty of sexual battery if he or she engages in sexual penetration with: . . . (d) A child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child."  Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2006).

[16]*See* Miss. Code Ann. § 97-3-65(1)(b) (Rev. 2006).

[17]Prior to the testimony of each child, the circuit judge took her into his chambers and "ask[ed] . . . a few questions to kind of make a general ruling in regard to whether they understand what they are doing and so forth . . . ."

[18]The Majority contends that the "yes"/"no" answers at trial (and during the videotaped interviews) indicate "leading and suggestive questions . . . ." (Maj. Op. at ¶ 3-4, 19). However, this contention is dispelled by a viewing of the videotape, and a reading of its transcript and the trial testimony, in their entirety, and taking into account each witness is a child of tender years.  As such, extensive excerpts from their testimony are provided.  The test is not whether the question can be answered "yes" or "no," but whether the inquiry suggests a desired response.  For example, "are you familiar with the works of William Faulkner?"  This question can be answered "yes" or "no" without suggesting the desired response.

A. Yes.

Q. Do you know what a finger is?

A. Yes.

Q. Did he try to do anything with his finger to your privates?

A. Yes.

Q. And what did he do?

A. He move it around.

Q. Did he put his finger in your privates?

A. Yes.

Q. Did you want him to do this?

A. No.

Q. Did your momma tell you . . . to make up a story about Curtis and say that he did it?

A. No.

Q. Do you remember the day that your momma saw y'all in the room in Oxford and got mad at you?

A. Yes.

Q. Did you . . . tell her that y'all were doing the nasty?

A. Yes.

Q. Who taught you to do the nasty?

A. Him.

Q. You mean Curtis?

A. Yes.

Q. And do you remember going to the hospital?

A. Yes.

Q. And do you also remember after you left the hospital going and talking to a lady in a room that had some dolls?

A. Yes.

Q. And did you tell her the truth?

A. Yes.

¶27. A.W. testified on cross-examination, as follows:

Q. And I think, . . . did you say that Curtis tried to put his finger in your privates, is that what you said?

A. Yes.

Q. And that upset you; is that right?

A. Yes.

Q. Okay. Had Marcus ever tried to put his finger in your privates?

A. No.

¶28. A.W.'s videotaped interview provided, as follows:

11

Q. . . . What do you know about coming here today and talking to me?
A. That you're going to check me out.
Q. What do you mean by checking out?
A. Because a man did something to us.
Q. . . . Who did something to y'all?
A. My auntie's boyfriend.
Q. Who's that?
A. Curtis.
. . .
Q. . . . What did Curtis do?
A. He sticked his finger up in my stuff while I was asleep.
Q. . . . If you were asleep, how did you know he did that?
A. Because I had woke up and told him to get off of me.
. . .
Q. . . . Point to me what you call stuff.
A. Right there.
. . .
Q. . . . Is Curtis a grown-up or a kid?
A. A grown-up.
Q. . . . What is his last name?
A. Curtis Sea.
. . .
Q. . . . [D]id Curtis put his finger in your stuff one time or more than one time?
A. More than one time.
. . .
Q. . . . What room were you in?
A. The living room.
. . .
Q. . . . [W]hen you say he came up there, where was he?
A. He was by me.
Q. . . . Was he sitting by you, laying by you, standing by you?
A. On his knee.
. . .
Q. . . . [Y]ou woke up and what was he doing when you woke up?
A. He was touching me and feeling me in my private.
Q. And when you say up in your private, . . . was it underneath your clothes, on top of your clothes, or some other way?
A. Underneath.
. . .
Q. Did he touch you on top of your panties or underneath.
A. Underneath.
. . .
Q. . . . [W]hat did your stuff feel like?

12

A. It was hurting.

Q. . . . What was his hand doing to you – or his finger doing to your stuff?

A. It was just moving.

Q. Was he moving it, was he staying still or something else?

A. Moving it.

. . .

Q. Did his mouth touch you on your skin or on your clothes?

A. Skin.

Q. . . . And what did his mouth do?

A. He just stick his tongue.

. . .

Q. Have you ever seen his stuff?

A. (Affirmative response.)

Q. How did you see it?

A. Because my sisters always did.

Q. What would your sisters always do?

A. They would get on top of his stuff.

. . .

Q. Did Curtis put his mouth on your stuff one time or more than one time?

A. One time.

Q. . . . And did he put his finger in your stuff one time or more than one time?

A. One time.

. . .

Q. Where were you when he put his stuff in your stuff or touched you with his stuff?

A. On the couch.

. . .

Q. . . . You were on the couch and then what happened?

A. He had stuck his thing out.

. . .

Q. . . . So you were laying on the couch and you say he stuck his thing out and then what happened?

A. He got on top of me.

Q. . . . And how were your clothes?

A. My clothes were up.

. . .

Q. Did his thing touch your skin or your clothes?

A. My skin.

Q. . . . And how did that happen?

A. He took my pants down.

. . .

Q. How did [Auntie Ollie Mae] not know?

A. Because he would always close the door.

13

. . .

Q. . . . Where were his clothes?

A. His clothes [were] off.

. . .

Q. . . . What was his body doing?

A. He just got on top of me.

. . .

Q. . . . What did your stuff feel like?

A. It was hurting.

. . .

Q. What was he doing right before he said he was going to get off of you?

A. He was moving on me.

. . .

Q. . . . [D]id you ever see Curtis doing anything to himself, touching himself anywhere?

A. (Affirmative response.)

Q. What did you see him do?

A. He was . . . messing with his thing.

Q. What was he doing?

A. He was shaking it up and down.

Q. Shaking it up and down. Was that on his skin or with his clothes?

A. With his hand.

. . .

Q. . . . What happened when he put you on top of him?

A. He took his thing out and put it in my butt.

. . .

A. He pulled my pants down.

. . .

A. He had layed me down.

. . .

A. He just pulled his thing out and put it in my butt.

¶29. T.J., six years old at the time of the incident and eight years old at trial, testified on direct examination, as follows:

Q. . . . Do you know where your privates are?

A. Yes, sir.

Q. Do you know where a boy's privates are?

A. Yes, sir.

Q. Okay. Did he . . . try to touch his privates to your privates?

A. Yes, sir.

Q. And do you know . . . what a finger is?

14

A. No, sir.

Q. Am I holding up a finger? Okay. Did he try to do something with his finger to your privates? You have to say yes or no. It's okay. Don't be scared. Did he try to do something with his finger to your privates?

A. Yes, sir.

Q. Okay. Did you want him to do that?

A. No, sir.

On cross-examination, T.J. denied that her eight-year-old cousin, Marcus, had ever tried to touch her privates.

¶30. T.J.'s videotaped interview provided, as follows:

Q. . . . Who's Curtis?

A. The man who lives in my Auntie Ollie Mae's house.

Q. I want to know if Curtis lives in your house with you or does he live somewhere else?

A. He lives somewhere else.

. . .

Q. . . . And who's Curtis?

A. Um, Auntie Ollie Mae's husband.

. . .

Q. . . . Well, what about your Aunt Ollie Mae and . . . Curtis. What about them?

A. Curtis was in the living room and my auntie was in the bedroom.

Q. Uh-huh.

A. And then we stayed in auntie's room and he woke us up.

Q. Uh-huh.

A. And then he said come with me and so we did and then we stayed on the couch where we slept.

Q. . . . Who is this a picture of? Is it a picture of a boy or a girl?

A. A girl.

. . .

Q. . . . [W]hat do you call this on a girl? What is this called?

A. The head.

Q. . . . And right there?

A. [T.J., in her own words, identifies "lips," "arms," "breasts," "naval," "*fingers*," "*private*," "leg," "toes," "back," "*booty*," and "legs"]

Q. . . . Now let's name the picture of the boy. What do you call this?

A. Head.

Q. . . . And right here?

A. . . . [T.J., in her own words, identifies "eyes," "mouth," "titties," "naval," "hand," "arm," "dick," "leg," "feet," "back," and "booty"]

Q. . . . Is it okay to touch your breasts?

A. (Negative response.)

. . .

Q. Is it okay for someone to touch your privates?

A. No.

. . .

Q. What about your booty?

A. No.

. . .

Q. . . . What about a boy's titties?

A. (Negative response.)

. . .

Q. Remember I need your answers out loud. What about their dick?

A. No.

Q. What about their legs?

A. Yes.

Q. . . . What about their back?

A. Yeah.

. . .

Q. . . . What about their booty?

A. No.

. . .

Q. . . . Has anyone touched your private or hurt your private?

A. No.

. . .

Q. . . . What would you do? Could you tell somebody? Who could you tell?

A. My momma.

Q. . . . Have you ever told your momma that someone had touched you? You told your momma that someone has touched you? Who did you tell your momma that touched you?

A. Curtis.

. . .

Q. . . . So, you told your momma that Curtis did something? What did you tell her Curtis did.

A. He had touched my privates.

Q. . . . What did he touch your private with? Okay. You are holding up your finger.

. . .

Q. . . . Is he a grown-up or a kid?

A. He's big.

Q. . . . [H]as Curtis touched your private one time or more than one time?

16

A. One time.

. . .

Q. . . . So who all was there?

A. My sisters.

Q. . . . Where was your aunt?

A. She was in the bed.

Q. . . . Did your sisters see Curtis touch you?

A. Uh-huh.

Q. How did they see?

A. They opened their eyes.

. . .

Q. So tell me what Curtis did to your privates because I wasn't there and I don't know what happened. Tell me.

A. He stuck his finger in it.

. . .

Q. . . . So were your jeans on or pulled down or off or something else?

A. Pulled up.

Q. . . . So how did Curtis stick his finger in your privates? Tell me how he did that.

. . .

A. He went like this. (Indicated.)

. . .

A. It was on top of my clothes.

. . .

Q. Did Curtis make you touch him anywhere on his body?

A. (Negative response.)

. . .

Q. . . . Did you see Curtis touch anybody else?

A. He touched my sister.

Q. What sisters did he touch?

A. [A.W.] and [D.D.].

. . .

Q. . . . And what happened when they pulled their clothes off?

A. They got on top of him.

Q. How were his clothes when they got on top of him?

A. They was down.

Q. . . . And did you see any part of his body when his clothes were down?

A. I saw his dick.

Q. . . . What did his dick look like?

A. Black.

. . .

Q. And were they moving or staying still or something else?

A. They were moving.

17

. . .

Q. What did you tell you[r] mom Curtis did?
A. He . . . stick his finger up in my private.

. . .

Q. . . . So when did you tell your mom?
A. The other day.

. . .

Q. . . . And what happened after you told her?
A. She . . . called the police.

. . .

Q. . . . Did your auntie see [A.W.] or [D.D.] naked on top of Curtis?
A. (Affirmative response.)
Q. What did she say when she saw them?
A. She said get off of him.

. . .

Q. How did their clothes get back on?
A. Because my aunt said get your clothes back on.

. . .

Q. . . . Did he ever do anything to [B.J.]?
A. (Negative response.)

(Emphasis added.)

¶31. B.J., four years old at the time of the incident and six years old at trial, testified on

direct examination, as follows:

Q. What did Curtis do to you? Or let me ask you this. Do you know where
your privates are?
A. Yes, sir.
Q. And do you know where a boy's privates are?
A. Yes, sir.
Q. Did Curtis do anything with his privates to your privates?
A. Yes, sir.
Q. And what did he do?
A. Move up and down.
Q. Okay. Did he try to put his privates in your privates?
A. Yes, sir.
Q. And did he do anything with your booty, your bottom?
A. Yes, sir.
Q. And did you want Curtis to do that?
A. No, sir.

. . .

18

Q. Did your momma ask you to tell these people that Curtis did this to you or . . . did he do it?
A. He did it.

¶32.   B.J. testified on cross-examination, as follows:

Q. Curtis didn't touch you, did he?
A. Yes, sir.
. . .
Q. You don't know how he touched you? Curtis's private parts never touched your private parts, did they?
A. Yes, sir.
Q. But you don't know how they did, do you?
A. No, sir.

¶33.   B.J.'s videotaped interview provided, as follows:

Q. . . . What do you call those on a girl?
A. Titties.
. . .
Q. . . . And that?
A. Private.
. . .
Q. . . . What do you call this on a boy?
A. Nasty stuff.
. . .
Q. . . . And right there?
A. Booty.
. . .
Q. . . . Is it okay for somebody to touch your privates?
. . .
A. No.
. . .
Q. What about your booty?
A. No.
. . .
Q. Is it okay to touch a boy's nasty stuff?
A. No.
. . .
Q. Is it okay to touch a boy's booty?
A. No.
. . .
Q. . . . Has anybody ever touched you in those places?

19

A. (Affirmative response.)
Q. Who did?
A. Curtis.
Q. Who is Curtis?
A. My [a]untie's boyfriend.

. . .

Q. . . . What did Curtis do?
A. He stick his private up in my private.

. . .

A. He was doing nasty stuff with my sisters and me.

. . .

Q. And he did nasty stuff with all of you?
A. Uh-huh.

. . .

Q. . . . What happened in the living room?  Tell me everything that happened.
A. He put his pants down and said come here and then he did it.
Q. . . . Did you see Curtis's private?
A. Yeah.
Q. What did it look like?
A. Brown.

. . .

Q. . . . [T]ell me who did Curtis do nasty stuff to first?
A. My sisters.
Q. Which ones?
A. [T.J.] and [A.W.].

. . .

A. He . . . told me to suck it.
Q. Tried to get you to suck what?
A. His private.

. . .

Q. . . . How did your private feel[?]
A. Hurt.

. . .

Q. So if you were on the couch and then what happened?  What did Curtis do?
A. He stuffed his hand in my private.

. . .

Q. What did his hand do to your private?
A. It . . . didn't feel good.

. . .

Q. . . . [W]hat did he do to your sisters?
A. He put his hand in my sisters' private.

. . .

Q. . . . Did Curtis put his privates into your booty?

A. (Affirmative response.)
Q. He did?  How did your booty feel?
A. Not good.
. . .
Q. . . . Did anybody tell you not to tell me something?
A. Um, everybody said don't tell.
Q. Who said don't tell?
A. Curtis.
Q. Curtis said don't tell?  What else did Curtis say?
A. He told me to shut my mouth and I didn't do it.

¶34.    While the charged abuse occurred prior to December 2006, it was not until January 21, 2007, that an investigation began.  That day, Lashawn Joyner, the children's mother, saw "the kids were kind of on top of each other" doing "nasty stuff."[19]  When Joyner asked where they had learned that, the children responded "Curtis."  Joyner then took the children to the hospital.  Water Valley Police Officer A.J. Hernandez was called to the hospital, where three of the children indicated to him that they had been molested.[20]  As part of the investigation, Officer Hernandez then contacted Family Crisis Services in Oxford, Mississippi, where interviews, conducted by a Department of Human Services social worker, were videotaped.[21]

¶35.    At trial, the jury was instructed on the sexual battery counts that Sea had "plac[ed] his finger into the vagina" of three of the minor girls (B.J., T.J., A.W.), "plac[ed] his penis into the anal opening" of two of the minor girls (D.D., A.W.), and "plac[ed] his tongue into the vagina" of A.W.  The jury found Sea not guilty on the statutory rape counts and the sexual

---

[19]The period of time between the charged conduct and the examination of the children neutralizes the significance of "no tearing or any signs of abuse" as empirical evidence of no criminal conduct. (Maj. Op. at ¶ 3).  Moreover, such evidence is not a prerequisite for conviction.

[20]According to Hernandez, A.W. was asleep at the time.

[21]Officer Hernandez and two other social workers watched the interviews from "a separate room divided by a two-way mirror . . . with audio intercom . . . ."

21

battery count involving D.D. Sea was found guilty on the remaining sexual battery counts against B.J., T.J., and A.W.

## ANALYSIS

¶36. Not all errors are worthy of reversal. For well over three decades of observing and trying cases or reviewing trial records, I have yet to discover a perfect trial. The jurists who have preceded us, recognizing this truth, have set the bar for appellate review at a realistic height, i.e., we look to determine if a defendant received a fair trial (not a perfect trial), taking into account the universal truth that to err is human. This leaves the appellate court to determine whether the defendant received a fair trial in spite of error.[22]

¶37. Here, the Majority passes no final judgment on the circuit court's admission of videotapes, but rather seizes upon the timing of an on-the-record analysis. The Majority criticizes the introduction of Sea's prior guilty pleas to sex offenses against minors based upon the time restrictions of Mississippi Rule of Evidence 609, as opposed to the exceptions to Mississippi Rule of Evidence 404(b). The Majority then knits the aforementioned to formulate its ultimate conclusion of ineffective assistance of counsel, which I shall address first.

### I.      Prematurity of Ineffective-Assistance-of-Counsel Claim

¶38. Sea's ineffective-assistance-of-counsel claim is premature, as we are given clear proof from the record that the issues in dispute were subject to pretrial discussions, outside the record. *See* ¶¶ 47, 49, 59 *infra*. Thus, a determination at this time is premised upon

---

[22]Such errors might include the circuit judge likely not viewing the videotapes outside the presence of the jury before admission.

undocumented assumptions, which should be clarified through an evidentiary hearing. *See*

*Read v. State*, 430 So. 2d 832, 841 (Miss. 1983).

¶39.　This Court has stated that:

> (1) Any defendant convicted of a crime may raise the issue of ineffective assistance of counsel on direct appeal, even though the matter has not first been presented to the trial court. The Court should review the entire record on appeal. If, . . . from a review of the record, . . . this Court can say that the defendant has been denied the effective assistance of counsel, the Court should also adjudge and reverse and remand for a new trial.
>
> (2) Assuming that the Court is unable to conclude from the record on appeal that defendant's trial counsel was constitutionally defective, the Court should then proceed to decide the other issues in the case. Should the case be reversed on other grounds, the ineffectiveness issue . . . would become moot. On the other hand, if the Court should otherwise affirm, it should do so without prejudice to the defendant's right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings. If the Court otherwise affirms, it may nevertheless reach the merits of the ineffectiveness issue where (a) as in paragraph (1) above, the record affirmatively shows ineffectiveness of constitutional dimensions, or (b) the parties stipulate that the record is adequate[23] and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc. are not needed.
>
> (3) If, after affirmance as in paragraph (2) above, the defendant wishes to do so, he may then file an appropriate post-conviction proceeding raising the ineffective assistance of counsel issue. Assuming that his application states a claim, prima facie, he will then be entitled to an evidentiary hearing on the merits of that issue in the [c]ircuit [c]ourt of the county wherein he was originally convicted. Once the issue has been formally adjudicated by the [c]ircuit [c]ourt, . . . the defendant will have the right to appeal to this Court as in other cases.

*Id*. at 841-42 (internal citations omitted). *See also **Colenburg v. State***, 735 So. 2d 1099,

1101-02 (Miss. Ct. App. 1999).

---

[23]The parties in this case made no such stipulation.

¶40. The Majority fails to follow *Read*'s instruction and finds ineffective assistance of counsel based upon the absence of on-the-record rulings by the circuit court regarding the videotapes and Sea's prior sex convictions involving minor girls. A review of the entire record reflects that the timeliness or lack of such on-the-record rulings is not case-dispositive. *See Read*, 430 So. 2d at 841. "The question presented on this appeal is not whether trial counsel was or was not ineffective but whether the trial judge, as a matter of law, had a duty to declare a mistrial or to order a new trial, *sua sponte* on the basis of trial counsel's performance." *Colenburg*, 735 So. 2d at 1102. Contrary to the Majority's inference otherwise, the record is clear that there were discussions regarding the videotape and prior-convictions issues, not contained in the record presented.[24] *See* ¶¶ 47, 49, 59 *infra*. As such, the ineffective-assistance-of-counsel issue "substantially raises issues of fact," which an appellate court is ill-suited to resolve. *Read*, 430 So. 2d at 842. Therefore, the proper course, if we were to affirm the conviction and sentence imposed upon Sea, would be to affirm "without prejudice to [his] right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings." *Id*. at 841. If Sea exercises that right, and assuming he states a prima facie claim, "he will then be entitled to an evidentiary hearing on the merits of that issue . . . ." *Id*. Only then would both the circuit court and this Court be adequately equipped to proceed on facts, instead of mere possibilities or assumptions, in considering whether Sea can rebut the "strong . . . presumption that counsel's conduct falls

---

[24]"[T]he appellant has the responsibility to present a trial record sufficient to undergird his assignments of error." *Edwards v. State*, 800 So. 2d 454, 468 (Miss. 2001).

24

within a broad range of reasonable professional assistance." ***Williams v. State***, 3 So. 3d 105, 111 (Miss. 2009) (quoting ***McQuarter v. State***, 574 So. 2d 685, 687 (Miss. 1990)).

## II.     Ineffective Assistance of Counsel

¶41.    As this Court spurns our precedent regarding ineffective-assistance-of-counsel claims on direct appeal, I alternatively address the substantive merits of Sea's ineffective-assistance-of-counsel claim.[25]  As Sea's substantive claims are without merit, I conclude that we should affirm.

¶42.    Viewing defense counsel's "over-all performance" under "the totality of the circumstances," I cannot conclude that "the strong . . . presumption that counsel's conduct falls within [the] broad range of reasonable professional assistance" has been rebutted.  ***Id***. Perhaps defense counsel's introduction of Sea's prior convictions was intended to "take the sting out" by preventing the jury from believing that Sea "was trying to hide anything[,]" a regularly employed trial strategy.

¶43.    Moreover, I am unpersuaded that a "reasonable probability" exists that "but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." ***Ransom v. State***, 919 So. 2d 887, 890 (Miss. 2005) (quoting ***Foster v. State***, 687 So. 2d 1124, 1129-30 (Miss. 1996)).  The circuit judge stated that if the State had introduced the prior convictions, they would have been admitted for the purposes allowed under Mississippi Rule of Evidence 404(b). *See* Miss. R. Evid. 404(b) ("[e]vidence of other crimes,

---

[25]Sea argues ineffective assistance of counsel "due to improper introduction of his prior convictions by his trial counsel and failure to seek a lesser included offense instruction for gratification of lust for each of the sexual battery counts."  As the Majority found the lesser-included-offense-instruction issue to be without merit, I address only the prior-convictions issue. (Maj. Op. at ¶ 22).

wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). Additionally, the jury was provided limiting instruction regarding the prior convictions. *See Gore v. State*, 37 So. 3d 1178, 1187 (Miss. 2010) (evidence admitted under Rule 404(b) is to be accompanied by a limiting instruction).

¶44. Finally, overwhelming, credible evidence was presented to the jury that Sea sexually abused three of the children. Weighing that evidence, the jury reached a unanimous decision to convict, while at the same time acquitting Sea on all statutory-rape counts and the sexual-battery count involving the youngest child, D.D., refuting the contention that the admission of prior convictions so infected this proceeding as to deny Sea a fair trial.[26] For these reasons, I cannot conclude that Sea has satisfied his burden on the prejudice prong.

¶45. "There is no constitutional right . . . to errorless counsel." *Ransom*, 919 So. 2d at 890 (quoting *Foster*, 687 So. 2d at 1129-30). This Court has stated that:

> [t]he test to be applied in cases involving alleged ineffectiveness of counsel is whether counsel's *over-all performance* was *(1) deficient and if so, (2) whether the deficient performance prejudiced the defense. Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The *burden is on the defendant to demonstrate both prongs. Leatherwood v. State*, 473 So. 2d 964, 968-69 (Miss. 1985).
>
> . . .
>
> This state recognizes a *strong but rebuttable presumption that counsel's conduct falls within a broad range of reasonable professional assistance. Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985). Also, this Court bases its

---

[26]In fact, should a defendant be acquitted, can it legitimately be argued that he was acquitted because of ineffective assistance of counsel?

decisions as to whether counsel's efforts were effective on the *totality of the circumstances* surrounding each case.

***Williams***, 3 So. 3d at 111 (quoting ***McQuarter***, 574 So. 2d at 687) (emphasis added).

¶46.  Prior to trial, Sea filed a "Motion for Discovery Under Rule 9.04 of the Uniform Circuit and County Court Rules" which requested, *inter alia*, "[c]opies of prior criminal records of the Defendant . . . ."  The State's response included a host of prior convictions, including aggravated burglary, forgery, larceny, sale of a controlled substance (cocaine), and unlawful possession of a controlled substance (cocaine) with the intent to sell and deliver, along with Sea's indictment and conviction records for sexual battery involving an underage female and aggravated sexual battery based upon "feloniously and forcibly hav[ing] sexual contact with . . . a female less than thirteen (13) year of age."[27]  Sea had pleaded guilty to the sexual-battery and aggravated-sexual-battery charges, and had served time for each.

¶47.  During voir dire examination, counsel for Sea conditioned the jury pool for the anticipated admission of prior convictions under Rule 404(b), stating:

> Q. . . . *We do expect there will be testimony of some prior bad acts or convictions involving [Sea] from years ago*.  Now, simply because of those prior acts, if there is anyone here who believes that simply because of those prior acts he must be guilty of what he's charged with here today, . . . please raise your hand . . . .
>
> . . .
>
> Q.  And despite then that there are some prior bad acts and convictions that *could* come in as evidence, if you still have a reasonable doubt in this case today, would you all still be able to vote not guilty?

---

[27]Correspondence between the district attorney's office and the Criminal Court of Shelby County, Tennessee, reflects that evidence of Sea's prior felony convictions was originally obtained as "[o]ur office is preparing to prosecute [Sea] as an habitual offender."

(Emphasis added.) At the outset of Sea's direct examination, defense counsel, seeking to "take the sting out" of the State's cross-examination, began, as follows:

> Q. Mr. Sea, I'm going to ask you some questions . . . . I don't have it right in front of me but *because . . . it is going to come out when the DA cross-examines*, I'm going to ask you about a couple prior convictions that you have.

(Emphasis added.) Defense counsel then questioned Sea about the aforementioned guilty pleas to sex crimes involving children. Sea acknowledged the first guilty plea to sexual battery, but stated that he was not involved in the later crime of aggravated sexual battery, although it took place in his apartment. During the State's cross-examination, Sea acknowledged his guilty pleas and convictions as to both.[28]

¶48. The jury also was given a limiting instruction that, "[y]ou have heard testimony that [Sea] has two prior convictions in Memphis. You are instructed that these convictions may not be used to determine the innocence or guilt of the defendant in this case. You must decide this case on the evidence and law." In reading this instruction, the circuit judge added:

> [d]o you see what I am saying? He was convicted of these according to the records or charged with these sometime prior and you can consider that but *you can't consider that as substantive evidence that that conduct makes him guilty of this conduct. These charges must be proven on their own*.

(Emphasis added.)

¶49. In closing argument, the State offered that "[y]ou've been instructed that you cannot use the two prior convictions to find innocence or guilt in this case. But what you are allowed to do is to use them to assess his credibility to whether or not he was, in fact, a

---

[28]Sea stated that "I'm not denying nothing, I just . . . forgot about it."

believable witness." Defense counsel objected to the State's reference to the prior convictions for impeachment purposes. Defense counsel added that "[i]t was my understanding they would be admitted" only "to show that there was *no lack of intent or something along those lines or motive*." (Emphasis added.) The circuit judge responded, "[t]hat *would have been true if the State had introduced them* but I think they are subject to comment now in closing arguments since the defense put them in as to credibility." (Emphasis added.) Thus, the strategy to "take the sting out" was not without risk. In Sea's closing argument, defense counsel stated:

> *I put those convictions in because I didn't want you to hear it from the State. . . . I didn't want those convictions to come out of [the prosecutor's] mouth and you to think that [Sea] was trying to hide anything from you*. . . . He entered pleas of guilty. He accepted responsibility and went on.

(Emphasis added.) Accepting responsibility when guilty, denying when innocent, is also a strategy employed by some effective defense attorneys.

### *(A) Deficient Performance*

¶50. As the effectiveness of counsel's efforts are determined based upon his "over-all performance" under "the totality of the circumstances[,]" the record reflects not only that defense counsel successfully represented Sea in receiving an acquittal on all statutory-rape counts and the sexual-battery count involving D.D., but also that the circuit judge commented positively on the performance of defense counsel. *Williams*, 3 So. 3d at 111. Following the children's testimony, outside the presence of the jury, Sea contended that defense counsel had "sold [him] out" by failing to ask the "right questions . . . to the right kid." The circuit judge responded that, "I'm not going to let [defense counsel] off your case. He's a good

29

lawyer and you need a good lawyer." At the post-trial motion hearing, addressing defense counsel's "Motion to Withdraw as Counsel," the circuit judge noted that "[h]e's done you a good job, Mr. Sea. I know you've been dissatisfied from the start. You know, he didn't put you where you were.[29] [Defense counsel] *has done everything in his power adequately and properly to represent you . . . .*" (Emphasis added.)

¶51.    Moreover, this Court has stated that "[w]ith respect to the overall performance of the attorney, 'counsel's failure to file certain motions, call certain witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy' and do[es] not give rise to an ineffective assistance of counsel claim." ***Pruitt v. State***, 807 So. 2d 1236, 1240 (Miss. 2002) (quoting ***Cole v. State***, 666 So. 2d 767, 777 (Miss. 1995)). Here, defense counsel's trial strategy can be seen clearly. He addressed the prior convictions on direct examination because "it is going to come out when the DA cross-examines" and he did not want the jury "to think that [Sea] was trying to hide anything from [them]." Two strategic reasons are apparent: (1) to "take the sting out" and (2) to show that when his client did commit a crime, he is man enough to "fess up" to his wrongdoing, a tactic regularly employed by defense counsel representing career criminals such as Sea. *See **Wright v. Royal Carpet Servs.***, 29 So. 3d 109, 118 (Miss. Ct. App. 2010) (Maxwell, J., concurring in part and in result) ("trial counsel adjusted his trial strategy to take the sting out of what he perceived to be damning evidence. This is fully permissible in light of the adverse ruling on the motion in limine."). This strategy, particularly in light of the circuit judge's later statement that such

---

[29]This point is lost upon the Majority.

30

convictions would have been admissible to prove intent and/or motive if introduced by the State, does not rise to the level of ineffective assistance.

¶52. Furthermore, when this lone purported error is considered within the context of defense counsel's "over-all performance," recognized by the circuit judge as "good," our "highly deferential" review does not support a finding of ineffective assistance on the record before us. *Williams*, 3 So. 3d at 111; *Pruitt*, 807 So. 2d at 1239.

### (B) Prejudice

¶53. But even assuming *arguendo* that the Majority's critique of defense counsel's performance is accurate, reversal requires more. The prejudice standard requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ransom*, 919 So. 2d at 890 (quoting *Foster*, 687 So. 2d at 1129-30). As such, the prejudice inquiry places an additional burden upon an appellate court, not unlike a juror's role of fact-finding, for an appellate court must review all of the evidence to determine whether the purported error(s) of counsel made any difference in the result of the proceeding.

¶54. Here, the circuit judge stated that, if they had been introduced by the State, these prior convictions would have been admissible to prove intent and/or motive.[30] *See* Miss. R. Evid. 404(b). Furthermore, the circuit court instructed the jury that such prior convictions "may

---

[30]The admission of prior convictions for the purposes outlined in Rule 404(b), unlike Rule 609, is not restricted by time limitations. *See* Miss. R. Evid. 609(b) (ten-year time limit for impeachment by evidence of prior convictions). Thus, the Majority's assertion that "[e]vidence of a party's prior criminal conduct, the confinement for which ended more than ten years earlier, is not admissible to impeach credibility, unless the trial court makes certain findings[,]" is misplaced. (Maj. Op. at ¶ 1).

not be used to determine the innocence or guilt of the defendant in this case." *See Gore*, 37 So. 3d at 1187 (reaffirming that the use of such evidence is limited to the exceptions stated in Rule 404(b)).

¶55.    It is the testimony of the child victims, among "the most innocent and defenseless in our society[,]" which convinces me that Sea would have been convicted, even in the absence of the prior convictions. *Id*. at 1185 (quoting *Derouen v. State*, 994 So. 2d 748, 756 (Miss. 2008)).  A.W., without equivocation, testified that Sea touched her "middle parts[;]" put his finger "up in [her] stuff" and "move[d] it around[;]" put his mouth on her "stuff" on one occasion; and "got on top of [her]" and put his privates in her privates and "in [her] butt[,]" while "[m]ov[ing] up and down."  T.J., without equivocation, testified that Sea "stuck his finger" in her privates and tried to touch his privates to her privates.  She added that Sea had A.W. take her clothes off and "g[e]t on top of him."  B.J., without equivocation, testified that Sea put "his private up in my private" and "booty[;]" instructed her to "suck . . . his private[;]" "[s]tuffed his hand in [her] private[;]" and did "nasty stuff" to T.J. and A.W. Thereafter, according to B.J., Sea warned her to "shut [her] mouth" about the incidents.  An objective review of this testimony from the "mouths of babes" offered overwhelming evidence of guilt to the jury that even an elite criminal defense attorney could not successfully fend off.  The Majority acknowledges as much, stating "the convictions are amply supported by the testimony of all four of the children and the incriminating content of the videotapes."  (Maj. Op. at ¶ 11).  In such circumstances, "I choose . . . not . . . to close my eyes to the reality of overwhelming evidence of guilt fairly established."  *Goff v. State*, 14 So. 3d 625, 677 (Miss. 2009) (Randolph, J., specially concurring, joined by Carlson, P.J.,

32

Dickinson, Lamar, and Pierce, JJ.) (citing *Milton v. Wainwright*, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178, 33 L. Ed. 2d 1 (1972)). We ought not forget that "justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L.Ed. 2d 720 (1991) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S. Ct. 330, 338, 78 L. Ed. 674 (1934) (*overruled on another issue by Malloy v. Hogan*, 378 U.S. 1, 17, 84 S. Ct. 1489, 1498, 12 L. Ed. 2d 653 (1964))). To disregard the overwhelming evidence in this case would needlessly sway that balance toward Sea, "plac[ing] a significant burden on society's interest in prosecuting criminal activity." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260, 176 L. Ed. 2d 1098 (2010) (citing *Davis v. United States*, 512 U.S. 452, 459-61, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *Moran v. Burbine*, 475 U.S. 412, 427, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

¶56. The jury's exoneration of Sea on some counts reflects considered deliberation, not a jury consumed by the purportedly "incendiary" proof of the prior convictions suggested by the Majority. (Maj. Op. at ¶ 20). The jury found that Sea was not guilty on the statutory-rape counts and the sexual-battery count involving D.D. (Maj. Op. at ¶ 8). The split verdicts belie the Majority's insistence upon the "incendiary" effect of these prior convictions. (Maj. Op. at ¶ 20).

¶57. Accordingly, Sea has not satisfied his burden of proving that "but for counsel's unprofessional errors" there is a "reasonable probability" that "the result of the proceeding would have been different." *Ransom*, 919 So. 2d at 890 (quoting *Foster*, 687 So. 2d at 1129-30).

33

### III.  Videotapes

¶58.  The record reveals that defense counsel made a hearsay objection before the videotapes were played to the jury, renewed his objection after the State had rested, and presented the issue again post-trial.  I find no abuse of discretion by the circuit court in overruling those objections based upon the "tender-years exception" of Mississippi Rule of Evidence 803(25).  *See* Miss. R. Evid. 803(25).  We all can agree that the circuit judge's ruling should have been made prior to displaying the videotapes before the jury, however, I would conclude that any putative prejudicial effect was cured by granting Sea additional cross examination of the children.[31]

¶59.  The Majority's finding that Sea "waived any objection to [the videotapes'] content," is misplaced.  (Maj. Op. at ¶ 9).  Prior to trial, Sea had filed a "Motion for Discovery Under Rule 9.04 of the Uniform Circuit and County Court Rules" which sought, *inter alia*, "a copy of all written and recorded statements relative to this case of any and all persons whom the State plans to call as witnesses . . . ."  In response, the State identified the videotapes, which were made "available for inspection at a mutually agreeable date, time and place."  When the State attempted to play the videotapes for the jury, defense counsel clearly stated, "I realize *this has been discussed in chambers to some extent*,[32] for the record, the defense objects to

---

[31]The effect of the introduction of the videotapes to the jury would have been prejudicial only had the circuit judge determined that they lacked trustworthiness, such that the jury had viewed inadmissible evidence.

[32]This was not the first reference to the videotapes in the record.  During voir dire, the district attorney stated "you will hear from all four of the children and they will testify as best they can about what happened.  *You're also going to hear or see some videotapes*."  (Emphasis added.)  Also during voir dire, defense counsel asked the jury pool whether each member could "promise that even after you have heard all the testimony *including video evidence . . . that if you have a reasonable*

34

the admissibility [of] the tapes as inadmissible hearsay." (Emphasis added.) The circuit court overruled Sea's objection, and the videotapes were played to the jury. After the State had rested, defense counsel "renew[ed] the objection to the tapes on the basis of hearsay[,]" while also moving for a directed verdict of not guilty on all counts. The circuit court overruled Sea's objection and denied Sea's motion for directed verdict. Finally, in Sea's "Motion for Judgment Notwithstanding the Verdict or, Alternatively, Motion for New Trial," defense counsel urged the circuit court that "[t]he [c]ourt committed error in allowing the [j]ury to consider hearsay testimony in the form of videotape recordings of the victims which were made out-of-court and offered for the truth of the matter asserted." At that post-trial motion hearing, the circuit judge stated that this issue was "*brought to my attention timely by counsel for [Sea] in the course of trial . . . .*" (Emphasis added.)

¶60.  "When reviewing evidentiary rulings made by the trial court, this Court employs an *abuse of discretion* standard." ***Brown v. State***, 965 So. 2d 1023, 1026 (Miss. 2007) (emphasis added). Rule 803(25), the "tender-years exception," provides:

> [a] statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is *admissible* in evidence *if*: (a) the court finds, in a *hearing conducted outside the presence of the jury*, that *the time, content, and circumstances of the statement* provide *substantial indicia of reliability*; *and* (b) the child either (1) *testifies at the proceedings*; or (2) is unavailable as a witness . . . .

Miss. R. Evid. 803(25) (emphasis added). The reasoning behind this hearsay exception recognizes the natural fear, hesitancy, reluctance, and nervousness that many children of tender years experience in communicating facts, due to the unfamiliar surroundings and

doubt as to [Sea's] guilt that you will vote not guilty?" (Emphasis added.) The State's opening statement provided that "you will get to see" the videotapes "of each child" from "start to finish."

individuals. As related by the State during voir dire examination, "there is the possibility, and I don't really know until they sit down, that these children are going to be scared about having to talk. And they may be a little bit quiet."

¶61. There is no dispute that each of the children testified at trial to provide substantive evidence, to lay a foundation for introduction of the videotapes, or a combination of both. All can agree the record does not reflect that the circuit court conducted a Rule 803(25) hearing outside the presence of the jury before the videotapes were played. But at the same time, we cannot ignore that, when the circuit judge overruled Sea's renewed objection, he did perform an on-the-record Rule 803(25) analysis, outside the presence of the jury. Of even greater import, to ensure that Sea was provided a fair trial, the circuit judge offered him the opportunity to call each of the four children for additional cross-examination. Specifically, the circuit judge stated that he:

> could tell by the content and the manner that the questions were asked that they were not trying to subject answers or prompt anything. It was an open-ended statement and the answers were not suggested by the interviewers.
>
> . . .
>
> The *time and content and the circumstances* all tie together with what they testified to in court and with what they tell the interviewer. The children seemed reliable when I interviewed them in chambers yesterday and they seemed reliable when they testified before the jury, and the best I could hear from the tapes, *they appeared to be reliable at the time of the interview. And that's one of the things that the trial judge is directed to do is look at the totality of the facts and circumstances surrounding this type of trial in 803(25) . . . to try to determine if there are substantial indicators of reliability . . . , and I think it is reliable enough to let this case go to a jury.*
>
> . . .

36

[I]t was *not a large span of time* that was spent *between the alleged events and the interview*. The . . . *children did seem to have recallability and seemed to be able to relate adequately to the interviewer* . . . and did a fair job understanding the questions and providing the answers that you would expect . . . .

. . .

[T]his was proper under the 803(25) tender years exception to hearsay rule and . . . *the children testified under oath, they've been available for trial, and I will permit recross if the defense wants recross*.

(Emphasis added.) The circuit court granted Sea the same opportunity to confront the child witnesses as if the hearing had been conducted prior to the videotapes being played. In sum, I cannot conclude that the circuit court's admission of the videotapes constituted an abuse of discretion. But even if one concludes that it was error, it was cured and, thus, harmless. Accordingly, it is not a basis for reversal.

## CONCLUSION

¶62. Based upon the aforementioned analysis, I would affirm Sea's conviction and sentence.

**WALLER, C.J., LAMAR AND PIERCE, JJ., JOIN THIS OPINION.**

37