RANDOLPH, Justice,
Dissenting:
¶ 25. A further elaboration of the facts presented is necessary before analysis of the legal issues can be fully explored. Forty-three-year-old Curtis Lernard Sea was indicted on nine counts of sexual battery[15] and statutory rape[16] against four sisters (D.D., B.J., T.J., and A.W.), three to eight years old at the time of the crimes.
*620 ¶ 26. A.W., eight years old at the time of the incident and ten years old at trial, testified[17] on direct examination, as follows:
Q. When you were over at your Aunt Ollie’s house, did Curtis do anything bad to you?
A. Yes.[18]
Q. And what did he do?
A. Touch.
Q. And where did he touch you?
A. My middle parts.
Q. You call your middle parts, do you call that your privates?
A. Yes.
Q. Do you know where a boy’s privates are?
A. Yes.
Q. Did he try to do anything with his privates to your privates?
A. Yes.
Q. And what did he do?
A. Move up and down.
Q. Did he put his privates inside you? A. Yes.
Q. Do you know what a finger is?
A. Yes.
Q. Did he try to do anything with his finger to your privates?
A. Yes.
Q. And what did he do?
A. He move it around.
Q. Did he put his finger in your privates?
A. Yes.
Q. Did you want him to do this?
A. No.
Q. Did your momma tell you ... to make up a story about Curtis and say that he did it?
A. No.
Q. Do you remember the day that your momma saw /all in the room in Oxford and got mad at you?
A. Yes.
Q. Did you ... tell her that y’all were doing the nasty?
A. Yes.
Q. Who taught you to do the nasty?
A. Him.
Q. You mean Curtis?
A. Yes.
Q. And do you remember going to the hospital?
A. Yes.
Q. And do you also remember after you left the hospital going and talking to a lady in a room that had some dolls?
A. Yes.
Q. And did you tell her the truth?
A. Yes.
¶ 27. A.W. testified on cross-examination, as follows:
*621 Q. And I think, ... did you say that Curtis tried to put his finger in your privates, is that what you said?
A. Yes.
Q. And that upset you; is that right?
A. Yes.
Q. Okay. Had Marcus ever tried to put his finger in your privates?
A. No.
¶28. A.W.’s videotaped interview provided, as follows:
Q. ... What do you know about coming here today and talking to me?
A. That you’re going to check me out. Q. What do you mean by checking out? A. Because a man did something to us. Q. ... Who did something to y’all?
A. My auntie’s boyfriend.
Q. Who’s that?
A. Curtis.
[[Image here]]
Q. ... What did Curtis do?
A. He sticked his finger up in my stuff while I was asleep.
Q. ... If you were asleep, how did you know he did that?
A. Because I had woke up and told him to get off of me.
[[Image here]]
Q. ... Point to me what you call stuff. A. Right there.
[[Image here]]
Q. ... Is Curtis a grown-up or a kid?
A. A grown-up.
Q. ... What is his last name?
A. Curtis Sea.
[[Image here]]
Q. ... [D]id Curtis put his finger in your stuff one time or more than one time?
A. More than one time.
[[Image here]]
Q. ... What room were you in?
A. The living room.
[[Image here]]
Q. ... [Wjhen you say he came up there, where was he?
A. He was by me.
Q. ... Was he sitting by you, laying by you, standing by you?
A. On his knee.
[[Image here]]
Q. ... [Y]ou woke up and what was he doing when you woke up?
A. He was touching me and feeling me in my private.
Q. And when you say up in your private, ... was it underneath your clothes, on top of your clothes, or some other way?
A. Underneath.
[[Image here]]
Q. Did he touch you on top of your panties or underneath.
A. Underneath.
[[Image here]]
Q. ... [W]hat did your stuff feel like?
A. It was hurting.
Q. ... What was his hand doing to you — or his finger doing to your stuff?
A. It was just moving.
Q. Was he moving it, was he staying still or something else?
A. Moving it.
[[Image here]]
Q. Did his mouth touch you on your skin or on your clothes?
A. Skin.
Q. ... And what did his mouth do?
A. He just stick his tongue.
[[Image here]]
Q. Have you ever seen his stuff?
A. (Affirmative response.)
Q. How did you see it?
*622 A. Because my sisters always did.
Q. What would your sisters always do?
A. They would get on top of his stuff.
[[Image here]]
Q. Did Curtis put his mouth on your stuff one time or more than one time?
A. One time.
Q. ... And did he put his finger in your stuff one time or more than one time?
A. One time.
[[Image here]]
Q. Where were you when he put his stuff in your stuff or touched you with his stuff?
A. On the couch.
[[Image here]]
Q. ... You were on the couch and then what happened?
A. He had stuck his thing out.
[[Image here]]
Q. ... So you were laying on the couch and you say he stuck his thing out and then what happened?
A. He got on top of me.
Q. ... And how were your clothes?
A. My clothes were up.
[[Image here]]
Q. Did his thing touch your skin or your clothes?
A. My skin.
Q. ... And how did that happen?
A. He took my pants down.
[[Image here]]
Q. How did [Auntie Ollie Mae] not know?
A. Because he would always close the door.
[[Image here]]
Q. ... Whei'e were his clothes?
A. His clothes [were] off.
[[Image here]]
Q. ... What was his body doing?
A. He just got on top of me.
[[Image here]]
Q. ... What did your stuff feel like?
A. It was hurting.
[[Image here]]
Q. What was he doing right before he said he was going to get off of you?
A. He was moving on me.
[[Image here]]
Q. ... [D]id you ever see Curtis doing anything to himself, touching himself anywhere?
A. (Affirmative response.)
Q. What did you see him do?
A. He was ... messing with his thing.
Q. What was he doing?
A. He was shaking it up and down.
Q. Shaking it up and down. Was that on his skin or with his clothes?
A. With his hand.
[[Image here]]
Q. ... What happened when he put you on top of him?
A. He took his thing out and put it in my butt.
[[Image here]]
A. He pulled my pants down.
[[Image here]]
A. He had layed me down.
[[Image here]]
A. He just pulled his thing out and put it in my butt.
¶ 29. T.J., six years old at the time of the incident and eight years old at trial, testified on direct examination, as follows:
Q. ... Do you know where your privates are?
A. Yes, sir.
Q. Do you know where a boy’s privates are?
A. Yes, sir.
*623 Q. Okay. Did he ... try to touch his privates to your privates?
A. Yes, sir.
Q. And do you know ... what a finger is?
A. No, sir.
Q. Am I holding up a finger? Okay. Did he try to do something with his finger to your privates? You have to say yes or no. It’s okay. Don’t be scared. Did he try to do something with his finger to your privates?
A. Yes, sir.
Q. Okay. Did you want him to do that?
A. No, sir.
On cross-examination, T.J. denied that her eight-year-old cousin, Marcus, had ever tried to touch her privates.
¶ 30. T.J.’s videotaped interview provided, as follows:
Q. ... Who’s Curtis?
A. The man who lives in my Auntie Ollie Mae’s house.
Q. I want to know if Curtis lives in your house with you or does he live somewhere else?
A. He lives somewhere else.
[[Image here]]
Q. ... And who’s Curtis?
A. Um, Auntie Ollie Mae’s husband.
[[Image here]]
Q. ... Well, what about your Aunt Ollie Mae and ... Curtis. What about them?
A. Curtis was in the living room and my auntie was in the bedroom.
Q. Uh-huh.
A. And then we stayed in auntie’s room and he woke us up.
Q. Uh-huh.
A. And then he said come with me and so we did and then we stayed on the couch where we slept.
Q. ... Who is this a picture of? Is it a picture of a boy or a girl?
A. A girl.
[[Image here]]
Q. ... [W]hat do you call this on a girl? What is this called?
A. The head.
Q. ... And right there?
A. [T.J., in her own words, identifies “lips,” “arms,” “breasts,” “naval,” “fingers,” “private,” “leg,” “toes,” “back,” “booty,” and “legs”]
Q. ... Now let’s name the picture of the boy. What do you call this?
A. Head.
Q. ... And right here?
A. ... [T.J., in her own words, identifies “eyes,” “mouth,” “titties,” “naval,” “hand,” “arm,” “dick,” “leg,” “feet,” “back,” and “booty ”]
Q. ... Is it okay to touch your breasts?
A. (Negative response.)
[[Image here]]
Q. Is it okay for someone to touch your privates?
A. No.
[[Image here]]
Q. What about your booty?
A. No.
[[Image here]]
Q. ... What about a boy’s titties?
A. (Negative response.)
[[Image here]]
Q. Remember I need your answers out loud. What about their dick?
A. No.
Q. What about their legs?
A. Yes.
Q. ... What about their back?
A. Yeah.
[[Image here]]
*624 Q. ... Wbat about their booty?
A. No.
[[Image here]]
Q. ... Has anyone touched your private or hurt your private?
A. No.
[[Image here]]
Q. ... What would you do? Could you tell somebody? Who could you tell?
A. My momma.
Q. ... Have you ever told your momma that someone had touched you? You told your momma that someone has touched you? Who did you tell your momma that touched you?
A. Curtis.
[[Image here]]
Q. ... So, you told your momma that Curtis did something? What did you tell her Curtis did.
A. He had touched my privates.
Q. ... What did he touch your private with? Okay. You are holding up your finger.
[[Image here]]
Q. ... Is he a grown-up or a kid?
A. He’s big.
Q. ... [H]as Curtis touched your private one time or more than one time? A. One time.
[[Image here]]
Q. ... So who all was there?
A. My sisters.
Q. ... Where was your aunt?
A. She was in the bed.
Q. ... Did your sisters see Curtis touch you?
A. Uh-huh.
Q. How did they see?
A. They opened their eyes.
[[Image here]]
Q. So tell me what Curtis did to your privates because I wasn’t there and I don’t know what happened. Tell me.
A. He stuck his finger in it.
[[Image here]]
Q. ... So were your jeans on or pulled down or off or something else?
A. Pulled up.
Q. ... So how did Curtis stick his finger in your privates? Tell me how he did that.
[[Image here]]
A. He went like this. (Indicated.)
[[Image here]]
A. It was on top of my clothes.
[[Image here]]
Q. Did Curtis make you touch him anywhere on his body?
A. (Negative response.)
[[Image here]]
Q. ... Did you see Curtis touch anybody else?
A. He touched my sister.
Q. What sisters did he touch?
A. [A.W.] and [D.D.],
[[Image here]]
Q. ... And what happened when they pulled their clothes off?
A. They got on top of him.
Q. How were his clothes when they got on top of him?
A. They was down.
Q. ... And did you see any part of his body when his clothes were down?
A. I saw his dick.
Q. ... What did his dick look like?
A. Black.
[[Image here]]
Q. And were they moving or staying still or something else?
A. They were moving.
[[Image here]]
*625 Q. What did you tell you[r] mom Curtis did?
A. He ... stick his finger up in my private.
[[Image here]]
Q. ... So when did you tell your mom?
A. The other day.
[[Image here]]
Q. ... And what happened after you told her?
A. She ... called the police.
[[Image here]]
Q. ... Did your auntie see [A.W.] or [D.D.] naked on top of Curtis?
A. (Affirmative response.)
Q. What did she say when she saw them?
A. She said get off of him.
[[Image here]]
Q. How did their clothes get back on?
A. Because my aunt said get your clothes back on.
[[Image here]]
Q. ... Did he ever do anything to [B.J.]?
A. (Negative response.)
(Emphasis added.)
¶ 31. B.J., four years old at the time of the incident and six years old at trial, testified on direct examination, as follows:
Q. What did Curtis do to you? Or let me ask you this. Do you know where your privates are?
A. Yes, sir. .
Q. And do you know where a boy’s privates are?
A. Yes, sir.
Q. Did Curtis do anything with his privates to your privates?
A. Yes, sir.
Q. And what did he do?
A. Move up and down.
Q. Okay. Did he try to put his privates in your privates?
A. Yes, sir.
Q. And did he do anything with your booty, your bottom?
A. Yes, sir.
Q. And did you want Curtis to do that? A. No, sir.
[[Image here]]
Q. Did your momma ask you to tell these people that Curtis did this to you or ... did he do it?
A. He did it.
¶ 32. B.J. testified on cross-examination, as follows:
Q. Curtis didn’t touch you, did he?
A. Yes, sir.
[[Image here]]
Q. You don’t know how he touched you? Curtis’s private parts never touched your private parts, did they? A. Yes, sir.
Q. But you don’t know how they did, do you?
A. No, sir.
¶ 33. B.J.’s videotaped interview provided, as follows:
Q. ... What do you call those on a girl?
Titties.
[[Image here]]
... And that?
Private.
:
... What do you call this on a boy? <©
Nasty stuff. ¡>
[[Image here]]
Q. ... And right there?
A. Booty.
[[Image here]]
Q. ... Is it okay for somebody to touch your privates?
*626 [[Image here]]
A. No.
[[Image here]]
Q. What about your booty?
A. No.
[[Image here]]
Q. Is it okay to touch a boy’s nasty stuff?
A. No.
[[Image here]]
Q. Is it okay to touch a boy’s booty?
A. No.
[[Image here]]
Q. ... Has anybody ever touched you in those places?
A. (Affirmative response.)
Q. Who did?
A. Curtis.
Q. Who is Curtis?
A. My [a]untie’s boyfriend.
[[Image here]]
Q. ... What did Curtis do?
A. He stick his private up in my private.
[[Image here]]
A. He was doing nasty stuff with my sisters and me.
[[Image here]]
Q. And he did nasty stuff with all of you?
A. Uh-huh.
[[Image here]]
Q. ... What happened in the living room? Tell me everything that happened.
A. He put his pants down and said come here and then he did it.
Q. ... Did you see Curtis’s private?
A. Yeah.
Q. What did it look like?
A. Brown.
[[Image here]]
Q. ... [T]ell me who did Curtis do nasty stuff to first?
A. My sisters.
Q. Which ones?
A. [T.J.] and [A.W.].
[[Image here]]
A. He ... told me to suck it.
Q. Tried to get you to suck what?
A. His private.
[[Image here]]
Q. ... How did your private feel[?]
A. Hurt.
[[Image here]]
Q. So if you were on the couch and then what happened? What did Curtis do?
A. He stuffed his hand in my private.
[[Image here]]
Q. What did his hand do to your private?
A. It ... didn’t feel good.
[[Image here]]
Q. ... [Wjhat did he do to your sisters?
A. He put his hand in my sisters’ private.
[[Image here]]
Q. ... Did Curtis put his privates into your booty?
A. (Affirmative response.)
Q. He did? How did your booty feel?
A. Not good.
[[Image here]]
Q. ... Did anybody tell you not to tell me something?
A. Um, everybody said don’t tell.
Q. Who said don’t tell?
A. Curtis.
Q. Curtis said don’t tell? What else did Curtis say?
*627 A. He told me to shut my mouth and I didn’t do it.
¶ 34. While the charged abuse occurred prior to December 2006, it was not until January 21, 2007, that an investigation began. That day, Lashawn Joyner, the children’s mother, saw “the kids were kind of on top of each other” doing “nasty stuff.”[19] When Joyner asked where they had learned that, the children responded “Curtis.” Joyner then took the children to the hospital. Water Valley Police Officer A.J. Hernandez was called to the hospital, where three of the children indicated to him that they had been molested.[20] As part of the investigation, Officer Hernandez then contacted Family Crisis Services in Oxford, Mississippi, where interviews, conducted by a Department of Human Services social worker, were videotaped.[21]
¶ 35. At trial, the jury was instructed on the sexual battery counts that Sea had “plae[ed] his finger into the vagina” of three of the minor girls (B.J., T.J., A.W.), “plae[ed] his penis into the anal opening” of two of the minor girls (D.D., A.W.), and “plae[ed] his tongue into the vagina” of A.W. The jury found Sea not guilty on the statutory rape counts and the sexual battery count involving D.D. Sea was found guilty on the remaining sexual battery counts against B.J., T.J., and A.W.
ANALYSIS
¶ 36. Not all errors are worthy of reversal. For well over three decades of observing and trying cases or reviewing trial records, I have yet to discover a perfect trial. The jurists who have preceded us, recognizing this truth, have set the bar for appellate review at a realistic height, i.e., we look to determine if a defendant received a fair trial (not a perfect trial), taking into account the universal truth that to err is human. This leaves the appellate court to determine whether the defendant received a fair trial in spite of error.[22]
¶ 37. Here, the Majority passes no final judgment on the circuit court’s admission of videotapes, but rather seizes upon the timing of an on-the-record analysis. The Majority criticizes the introduction of Sea’s prior guilty pleas to sex offenses against minors based upon the time restrictions of Mississippi Rule of Evidence 609, as opposed to the exceptions to Mississippi Rule of Evidence 404(b). The Majority then knits the aforementioned to formulate its ultimate conclusion of ineffective assistance of counsel, which I shall address first.
I. Prematurity of Ineffective-Assistance-of-Counsel Claim
¶ 38. Sea’s ineffective-assistance-of-counsel claim is premature, as we are given clear proof from the record that the issues in dispute were subject to pretrial discussions, outside the record. See ¶¶ 47, 49, 59 infra. Thus, a determination at this time is premised upon undocumented assumptions, which should be clarified *628 through an evidentiary hearing. See Read v. State, 430 So.2d 882, 841 (Miss.1983).
¶ 39. This Court has stated that:
(1) Any defendant convicted of a crime may raise the issue of ineffective assistance of counsel on direct appeal, even though the matter has not first been presented to the trial court. The Court should review the entire record on appeal. If, ... from a review of the record, ... this Court can say that the defendant has been denied the effective assistance of counsel, the Court should also adjudge and reverse and remand for a new trial.
(2) Assuming that the Court is unable to conclude from the record on appeal that defendant’s trial counsel was constitutionally defective, the Court should then proceed to decide the other issues in the case. Should the case be reversed on other grounds, the ineffectiveness issue ... would become moot. On the other hand, if the Court should otherwise affirm, it should do so without prejudice to the defendant’s right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings. If the Court otherwise affirms, it may nevertheless reach the merits of the ineffectiveness issue where (a) as in paragraph (1) above, the record affirmatively shows ineffectiveness of constitutional dimensions, or (b) the parties stipulate that the record is adequate [23j and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc. are not needed.
(3) If, after affirmance as in paragraph (2) above, the defendant wishes to do so, he may then file an appropriate post-conviction proceeding raising the ineffective assistance of counsel issue. Assuming that his application states a claim, prima facie, he will then be entitled to an evidentiary hearing on the merits of that issue in the [cjircuit [cjourt of the county wherein he was originally convicted. Once the issue has been formally adjudicated by the [cjircuit [cjourt, ... the defendant will have the right to appeal to this Court as in other cases.
Id. at 841-42 (internal citations omitted). See also Colenburg v. State, 735 So.2d 1099, 1101-02 (Miss.Ct.App.1999).
¶ 40. The Majority fails to follow Read’s instruction and finds ineffective assistance of counsel based upon the absence of on-the-record rulings by the circuit court regarding the videotapes and Sea’s prior sex convictions involving minor girls. A review of the entire record reflects that the timeliness or lack of such on-the-record rulings is not case-dispositive. See Read, 430 So.2d at 841. “The question presented on this appeal is not whether trial counsel was or was not ineffective but whether the trial judge, as a matter of law, had a duty to declare a mistrial or to order a new trial, sua sponte on the basis of trial counsel’s performance.” Colenburg, 735 So.2d at 1102. Contrary to the Majority’s inference otherwise, the record is clear that there were discussions regarding the videotape and prior-convictions issues, not contained in the record presented.[24] See ¶¶47, 49, 59 infra. As such, the ineffective-assistance-of-counsel issue “substantially raises issues of fact,” which an appellate court is ill-suited to resolve. Read, 430 So.2d at 842. Therefore, the proper course, if we were to affirm the conviction and sentence imposed upon Sea, would be *629 to affirm “without prejudice to [his] right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings.” Id. at 841. If Sea exercises that right, and assuming he states a prima facie claim, “he will then be entitled to an evidentiary hearing on the merits of that issue.... ” Id. Only then would both the circuit court and this Court be adequately equipped to proceed on facts, instead of mere possibilities or assumptions, in considering whether Sea can rebut the “strong ... presumption that counsel’s conduct falls within a broad range of reasonable professional assistance.” Williams v. State, 3 So.3d 105, 111 (Miss.2009) (quoting McQuarter v. State, 574 So.2d 685, 687 (Miss.1990)).
II. Ineffective Assistance of Counsel
¶41. As this Court spurns our precedent regarding ineffective-assistance-of-counsel claims on direct appeal, I alternatively address the substantive merits of Sea’s ineffective-assistance-of-counsel claim.[25] As Sea’s substantive claims are without merit, I conclude that we should affirm.
¶42. Viewing defense counsel’s “overall performance” under “the totality of the circumstances,” I cannot conclude that “the strong ... presumption that counsel’s conduct falls within [the] broad range of reasonable professional assistance” has been rebutted. Id. Perhaps defense counsel’s introduction of Sea’s prior convictions was intended to “take the sting out” by preventing the jury from believing that Sea “was trying to hide anything!,]” a regularly employed trial strategy.
¶ 43. Moreover, I am unpersuaded that a “reasonable probability” exists that “but for counsel’s [alleged] unprofessional errors, the result of the proceeding would have been different.” Ransom v. State, 919 So.2d 887, 890 (Miss.2005) (quoting Foster v. State, 687 So.2d 1124, 1129-30 (Miss.1996)). The circuit judge stated that if the State had introduced the prior convictions, they would have been admitted for the purposes allowed under Mississippi Rule of Evidence 404(b). See Miss. R. Evid. 404(b) (“[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.”). Additionally, the jury was provided limiting instruction regarding the prior convictions. See Gore v. State, 37 So.3d 1178, 1187 (Miss.2010) (evidence admitted under Rule 404(b) is to be accompanied by a limiting instruction).
¶ 44. Finally, overwhelming, credible evidence was presented to the jury that Sea sexually abused three of the children. Weighing that evidence, the jury reached a unanimous decision to convict, while at the same time acquitting Sea on all statutory-rape counts and the sexual-battery count involving the youngest child, D.D., refuting the contention that the admission of prior convictions so infected this proceeding as to deny Sea a fair trial.[26] For these rea *630 sons, I cannot conclude that Sea has satisfied his burden on the prejudice prong.
¶45. “There is no constitutional right ... to errorless counsel.” Ransom, 919 So.2d at 890 (quoting Foster, 687 So.2d at 1129-30). This Court has stated that:
[t]he test to be applied in cases involving alleged ineffectiveness of counsel is whether counsel’s over-all performance was (1) deficient and if so, (2) whether the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden is on the defendant to demonstrate both prongs. Leather-wood v. State, 473 So.2d 964, 968-69 (Miss.1985).
[[Image here]]
This state recognizes a strong but re-buttable presumption that counsel’s conduct falls within a broad range of reasonable professional assistance. Gilliard v. State, 462 So.2d 710, 714 (Miss.1985). Also, this Court bases its decisions as to whether counsel’s efforts were effective on the totality of the circumstances surrounding each case.
Williams, 3 So.3d at 111 (quoting McQuarter, 574 So.2d at 687) (emphasis added).
¶ 46. Prior to trial, Sea filed a “Motion for Discovery Under Rule 9.04 of the Uniform Circuit and County Court Rules” which requested, inter alia, “[c]opies of prior criminal records of the Defendant .... ” The State’s response included a host of prior convictions, including aggravated burglary, forgery, larceny, sale of a controlled substance (cocaine), and unlawful possession of a controlled substance (cocaine) with the intent to sell and deliver, along with Sea’s indictment and conviction records for sexual battery involving an underage female and aggravated sexual battery based upon “feloniously and forcibly hav[ing] sexual contact with ... a female less than thirteen (13) year of age.”[27] Sea had pleaded guilty to the sexual-battery and aggravated-sexual-battery charges, and had served time for each.
¶ 47. During voir dire examination, counsel for Sea conditioned the jury pool for the anticipated admission of prior convictions under Rule 404(b), stating:
Q. ... We do expect there will be testimony of some prior bad acts or convictions involving [Sea] from years ago. Now, simply because of those prior acts, if there is anyone here who believes that simply because of those prior acts he must be guilty of what he’s charged with here today, ... please raise your hand....
[[Image here]]
Q. And despite then that there are some prior bad acts and convictions that could come in as evidence, if you still have a reasonable doubt in this case today, would you all still be able to vote not guilty?
(Emphasis added.) At the outset of Sea’s direct examination, defense counsel, seeking to “take the sting out” of the State’s cross-examination, began, as follows:
Q. Mr. Sea, I’m going to ask you some questions.... I don’t have it right in front of me but because ... it is going to come out when the DA cross-examines, I’m going to ask you about a couple prior convictions that you have.
(Emphasis added.) Defense counsel then questioned Sea about the aforementioned guilty pleas to sex crimes involving children. Sea acknowledged the first guilty *631 plea to sexual battery, but stated that he was not involved in the later crime of aggravated sexual battery, although it took place in his apartment. During the State’s cross-examination, Sea acknowledged his guilty pleas and convictions as to both.[28]
¶ 48. The jury also was given a limiting instruction that, “[y]ou have heard testimony that [Sea] has two prior convictions in Memphis. You are instructed that these convictions may not be used to determine the innocence or guilt of the defendant in this case. You must decide this case on the evidence and law.” In reading this instruction, the circuit judge added:
[d]o you see what I am saying? He was convicted of these according to the records or charged with these sometime prior and you can consider that but you can’t consider that as substantive evidence that that conduct makes him guilty of this conduct. These charges must be proven on their own.
(Emphasis added.)
¶49. In closing argument, the State offered that “[y]ou’ve been instructed that you cannot use the two prior convictions to find innocence or guilt in this case. But what you are allowed to do is to use them to assess his credibility to whether or not he was, in fact, a believable witness.” Defense counsel objected to the State’s reference to the prior convictions for impeachment purposes. Defense counsel added that “[i]t was my understanding they would be admitted” only “to show that there was no lack of intent or something along those lines or motive.” (Emphasis added.) The circuit judge responded, “[t]hat would have been true if the State had introduced them but I think they are subject to comment now in closing arguments since the defense put them in as to credibility.” (Emphasis added.) Thus, the strategy to “take the sting out” was not without risk. In Sea’s closing argument, defense counsel stated:
I put those convictions in because I didn’t want you to hear it from the State.... I didn’t want those convictions to come out of [the prosecutor’s] mouth and you to think that [Sea] was trying to hiele anything from you. ... He entered pleas of guilty. He accepted responsibility and went on.
(Emphasis added.) Accepting responsibility when guilty, denying when innocent, is also a strategy employed by some effective defense attorneys.

(A) Deficient Performance

¶ 50. As the effectiveness of counsel’s efforts are determined based upon his “over-all performance” under “the totality of the circumstances[,]” the record reflects not only that defense counsel successfully represented Sea in receiving an acquittal on all statutory-rape counts and the sexual-battery count involving D.D., but also that the circuit judge commented positively on the performance of defense counsel. Williams, 3 So.3d at 111. Following the children’s testimony, outside the presence of the jury, Sea contended that defense counsel had “sold [him] out” by failing to ask the “right questions ... to the right kid.” The circuit judge responded that, “I’m not going to let [defense counsel] off your case. He’s a good lawyer and you need a good lawyer.” At the post-trial motion hearing, addressing defense counsel’s “Motion to Withdraw as Counsel,” the circuit judge noted that “[h]e’s done you a good job, Mr. Sea. I know you’ve been dissatisfied from the start. You know, he didn’t put you where you were.[29] [Defense counsel] has done everything in his *632 power adequately and properly to represent you ...(Emphasis added.)
¶ 51. Moreover, this Court has stated that “[wjith respect to the overall performance of the attorney, ‘counsel’s failure to file certain motions, call certain witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy1 and do[es] not give rise to an ineffective assistance of counsel claim.” Pruitt v. State, 807 So.2d 1236, 1240 (Miss.2002) (quoting Cole v. State, 666 So.2d 767, 777 (Miss.1995)). Here, defense counsel’s trial strategy can be seen .clearly. He addressed the prior convictions on direct examination because “it is going to come out when the DA cross-examines” and he did not want the jury “to think that [Sea] was trying to hide anything from [them].” Two strategic reasons are apparent: (1) to “take the sting out” and (2) to show that when his client did commit a crime, he is man enough to “fess up” to his wrongdoing, a tactic regularly employed by defense counsel representing career criminals such as Sea. See Wright v. Royal Carpet Servs., 29 So.3d 109, 118 (Miss.Ct.App.2010) (Maxwell, J., concurring in part and in result) (“trial counsel adjusted his trial strategy to take the sting out of what he perceived to be damning evidence. This is fully permissible in light of the adverse ruling on the motion in limine.”). This strategy, particularly in light of the circuit judge’s later statement that such convictions would have been admissible to prove intent and/or motive if introduced by the State, does not rise to the level of ineffective assistance.
¶ 52. Furthermore, when this lone purported error is considered within the context of defense counsel’s “over-all performance,” recognized by the circuit judge as “good,” our “highly deferential” review does not support a finding of ineffective assistance on the record before us. Williams, 3 So.3d at 111; Pruitt, 807 So.2d at 1239.

(B) Prejudice

¶ 53. But even assuming arguendo that the Majority’s critique of defense counsel’s performance is accurate, reversal requires more. The prejudice standard requires “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Ransom, 919 So.2d at 890 (quoting Foster, 687 So.2d at 1129-30). As such, the prejudice inquiry places an additional burden upon an appellate court, not unlike a juror’s role of fact-finding, for an appellate court must review all of the evidence to determine whether the purported error(s) of counsel made any difference in the result of the proceeding.
¶ 54. Here, the circuit judge stated that, if they had been introduced by the State, these prior convictions would have been admissible to prove intent and/or motive.[30] See Miss. R. Evid. 404(b). Furthermore, the circuit court instructed the jury that such prior convictions “may not be used to determine the innocence or guilt of the defendant in this case.” See Gore, 37 So.3d at 1187 (reaffirming that the use of such evidence is limited to the exceptions stated in Rule 404(b)).
¶ 55. It is the testimony of the child victims, among “the most innocent and defenseless in our society[,]” which con *633 vinces me that Sea would have been convicted, even in the absence of the prior convictions. Id. at 1185 (quoting Derouen v. State, 994 So.2d 748, 756 (Miss.2008)). A.W., without equivocation, testified that Sea touched her “middle parts[;]” put his finger “up in [her] stuff’ and “move[d] it around[;]” put his mouth on her “stuff’ on one occasion; and “got on top of [her]” and put his privates in her privates and “in [her] butt[,]” while “[m]ov[ing] up and down.” T.J., without equivocation, testified that Sea “stuck his finger” in her privates and tried to touch his privates to her privates. She added that Sea had A.W. take her clothes off and “g[e]t on top of him.” B.J., without equivocation, testified that Sea put “his private up in my private” and “booty[;]” instructed her to “suck ... his private[;]” “[s]tuffed his hand in [her] privatef;]” and did “nasty stuff’ to T.J. and A.W. Thereafter, according to B.J., Sea warned her to “shut [her] mouth” about the incidents. An objective review of this testimony from the “mouths of babes” offered overwhelming evidence of guilt to the jury that even an elite criminal defense attorney could not successfully fend off. The Majority acknowledges as much, stating “the convictions are amply supported by the testimony of all four of the children and the incriminating content of the videotapes.” (Maj. Op. at ¶ 11). In such circumstances, “I choose ... not ... to close my eyes to the reality of overwhelming evidence of guilt fairly established.” Goff v. State, 14 So.3d 625, 677 (Miss.2009) (Randolph, J., specially concurring, joined by Carlson, P.J., Dickinson, Lamar, and Pierce, JJ.) (citing Milton v. Wainwright, 407 U.S. 871, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972)). We ought not forget that “justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.” Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (quoting Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934) (overruled on another issue by Malloy v. Hogan, 378 U.S. 1, 17, 84 S.Ct. 1489, 1498, 12 L.Ed.2d 653 (1964))). To disregard the overwhelming evidence in this case would needlessly sway that balance toward Sea, “placfing] a significant burden on society’s interest in prosecuting criminal activity.” Berghuis v. Thompkins, — U.S.-, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (citing Davis v. United States, 512 U.S. 452, 459-61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); Moran v. Burbine, 475 U.S. 412, 427, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).
¶ 56. The jury’s exoneration of Sea on some counts reflects considered deliberation, not a jury consumed by the purportedly “incendiary” proof of the prior convictions suggested by the Majority. (Maj. Op. at ¶ 20). The jury found that Sea was not guilty on the statutory-rape counts and the sexual-battery count involving D.D. (Maj. Op. at ¶ 8). The split verdicts belie the Majority’s insistence upon the “incendiary” effect of these prior convictions. (Maj. Op. at ¶ 20).
¶ 57. Accordingly, Sea has not satisfied his burden of proving that “but for counsel’s unprofessional errors” there is a “reasonable probability” that “the result of the proceeding would have been different.” Ransom, 919 So.2d at 890 (quoting Foster, 687 So.2d at 1129-30).
III. Videotapes
¶ 58. The record reveals that defense counsel made a hearsay objection before the videotapes were played to the jury, renewed his objection after the State had rested, and presented the issue again post-trial. I find no abuse of discretion by the circuit court in overruling those objections *634 based upon the “tender-years exception” of Mississippi Rule of Evidence 803(25). See Miss. R. Evid. 803(25). We all can agree that the circuit judge’s ruling should have been made prior to displaying the videotapes before the jury, however, I would conclude that any putative prejudicial effect was cured by granting Sea additional cross examination of the children.[31]
¶ 59. The Majority’s finding that Sea “waived any objection to [the videotapes’] content,” is misplaced. (Maj. Op. at ¶ 9). Prior to trial, Sea had filed a “Motion for Discovery Under Rule 9.04 of the Uniform Circuit and County Court Rules” which sought, inter alia, “a copy of all written and recorded statements relative to this case of any and all persons whom the State plans to call as witnesses.... ” In response, the State identified the videotapes, which were made “available for inspection at a mutually agreeable date, time and place.” When the State attempted to play the videotapes for the jury, defense counsel clearly stated, “I realize this has been discussed in chambers to some extent>[32] for the record, the defense objects to the admissibility [of] the tapes as inadmissible hearsay.” (Emphasis added.) The circuit court overruled Sea’s objection, and the videotapes were played to the jury. After the State had rested, defense counsel “renew[ed] the objection to the tapes on the basis of hearsay[,]” while also moving for a directed verdict of not guilty on all counts. The circuit court overruled Sea’s objection and denied Sea’s motion for directed verdict. Finally, in Sea’s “Motion for Judgment Notwithstanding the Verdict or, Alternatively, Motion for New Trial,” defense counsel urged the circuit court that “[t]he [c]ourt committed error in allowing the [J]ury to consider hearsay testimony in the form of videotape recordings of the victims which were made out-of-court and offered for the truth of the matter asserted.” At that post-trial motion hearing, the circuit judge stated that this issue was “brought to my attention timely by counsel for [Sea] in the course of trial .... ” (Emphasis added.)
¶ 60. “When reviewing evidentiary rulings made by the trial court, this Court employs an abuse of discretion standard.” Brown v. State, 965 So.2d 1023, 1026 (Miss.2007) (emphasis added). Rule 803(25), the “tender-years exception,” provides:
[a] statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness....
Miss. R. Evid. 803(25) (emphasis added). The reasoning behind this hearsay exception recognizes the natural fear, hesitancy, *635 reluctance, and nervousness that many children of tender years experience in communicating facts, due to the unfamiliar surroundings and individuals. As related by the State during voir dire examination, “there is the possibility, and I don’t really know until they sit down, that these children are going to be scared about having to talk. And they may be a little bit quiet.”
¶ 61. There is no dispute that each of the children testified at trial to provide substantive evidence, to lay a foundation for introduction of the videotapes, or a combination of both. All can agree the record does not reflect that the circuit court conducted a Rule 803(25) hearing outside the presence of the jury before the videotapes were played. But at the same time, we cannot ignore that, when the circuit judge overruled Sea’s renewed objection, he did perform an on-the-record Rule 803(25) analysis, outside the presence of the jury. Of even greater import, to ensure that Sea was provided a fair trial, the circuit judge offered him the opportunity to call each of the four children for additional cross-examination. Specifically, the circuit judge stated that he:
could tell by the content and the manner that the questions were asked that they were not trying to subject answers or prompt anything. It was an open-ended statement and the answers were not suggested by the interviewers.
[[Image here]]
The time and content and the circumstances all tie together with what they testified to in court and with what they tell the interviewer. The children seemed reliable when I interviewed them in chambers yesterday and they seemed reliable when they testified before the jury, and the best I could hear from the tapes, they appeared to be reliable at the time of the interview. And that’s one of the things that the trial judge is directed to do is look at the totality of the facts and circumstances surrounding this type of trial in 803(25) ... to try to determine if there are substantial indicators of reliability ..., and I think it is reliable enough to let this case go to a jury.
[[Image here]]
[I]t was not a large span of time that was spent between the alleged events and the interview. The ... children did seem to have recallability and seemed to be able to relate adequately to the interviewer ... and did a fair job understanding the questions and providing the answers that you would expect. ...
[[Image here]]
[T]his was proper under the 803(25) tender years exception to hearsay rule and ... the children testified under oath, they’ve been available for trial, and I will permit recross if the defense wants recross.
(Emphasis added.) The circuit court granted Sea the same opportunity to confront the child witnesses as if the hearing had been conducted prior to the videotapes being played. In sum, I cannot conclude that the circuit court’s admission of the videotapes constituted an abuse of discretion. But even if one concludes that it was error, it was cured and, thus, harmless. Accordingly, it is not a basis for reversal.
CONCLUSION
¶ 62. Based upon the aforementioned analysis, I would affirm Sea’s conviction and sentence.
WALLER, C.J., LAMAR AND PIERCE, JJ., JOIN THIS OPINION.

. Mississippi Code Section 97 — 3—95(l)(d) provides that "[a] person is guilty of sexual battery if he or she engages in sexual penetration with: ... (d) A child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child.” Miss.Code Ann. § 97-3-95(l)(d) (Rev.2006).

. See Miss.Code Ann. § 97 — 3—65(l)(b) (Rev. 2006).

. Prior to the testimony of each child, the circuit judge took her into his chambers and “ask[edj ... a few questions to kind of make a general ruling in regard to whether they understand what they are doing and so forth....”

. The Majority contends that the '‘yes'V“no” answers at trial (and during the videotaped interviews) indicate "leading and suggestive questions....” (Maj. Op. at ¶ 3-4, 19). However, this contention is dispelled by a viewing of the videotape, and a reading of its transcript and the trial testimony, in their entirety, and taking into account each witness is a child of tender years. As such, extensive excerpts from their testimony are provided. The test is not whether die question can be answered "yes” or “no,” but whether the inquiry suggests a desired response. For example, "are you familiar with the works of William Faulkner?” This question can be answered "yes” or "no” without suggesting the desired response.

. The period of time between the charged conduct and the examination of the children neutralizes the significance of “no tearing or any signs of abuse” as empirical evidence of no criminal conduct. (Maj. Op. at ¶ 3). Moreover, such evidence is not a prerequisite for conviction.

. According to Hernandez, A.W. was asleep at the time.

. Officer Hernandez and two other social workers watched the interviews from "a separate room divided by a two-way mirror ... with audio intercom...."

. Such errors might include the circuit judge likely not viewing the videotapes outside the presence of the jury before admission.

. The parties in this case made no such stipulation.

. "[T]he appellant has the responsibility to present a trial record sufficient to undergird his assignments of error.” Edwards v. State, 800 So.2d 454, 468 (Miss.2001).

. Sea argues ineffective assistance of counsel "due to improper introduction of his prior convictions by his trial counsel and failure to seek a lesser included offense instruction for gratification of lust for each of the sexual battery counts.” As the Majority found the lesser-included-offense-instruction issue to be without merit, I address only the prior-convictions issue. (Maj. Op. at ¶ 22).

. In fact, should a defendant be acquitted, can it legitimately be argued that he was acquitted because of ineffective assistance of counsel?

. Correspondence between the district attorney’s office and the Criminal Court of Shelby County, Tennessee, reflects that evidence of Sea’s prior felony convictions was originally obtained as ”[o]ur office is preparing to prosecute [Sea] as an habitual offender.”

. Sea stated that “I’m not denying nothing, I just ... forgot about it.”

. This point is lost upon the Majority.

. The admission of prior convictions for the purposes outlined in Rule 404(b), unlike Rule 609, is not restricted by time limitations. See Miss. R. Evid. 609(b) (ten-year time limit for impeachment by evidence of prior convictions). Thus, the Majority's assertion that "[ejvidence of a party's prior criminal conduct, the confinement for which ended more than ten years earlier, is not admissible to impeach credibility, unless the trial court makes certain findings!,]” is misplaced. (Maj. Op. at ¶ 1).

. The effect of the introduction of the videotapes to the jury would have been prejudicial only had the circuit judge determined that they lacked trustworthiness, such that the jury had viewed inadmissible evidence.

. This was not the first reference to the videotapes in the record. During voir dire, the district attorney stated "you will hear from all four of the children and they will testify as best they can about what happened. You’re also going to hear or see some videotapes." (Emphasis added.) Also during voir dire, defense counsel asked the jury pool whether each member could "promise that even after you have heard all the testimony including video evidence ... that if you have a reasonable doubt as to [Sea's] guilt that you will vote not guilty?” (Emphasis added.) The State’s opening statement provided that "you will get to see” the videotapes "of each child” from "start to finish.”